[No. B185373. Second Dist., Div. Two. May 9, 2007.]

AB CELLULAR LA, LLC, et al., Plaintiffs and Appellants, v.
CITY OF LOS ANGELES, Defendant and Appellant.

**COUNSEL**

Munger, Tolles & Olson, Stuart N. Senator and Michelle Friedland for Plaintiffs and Appellants.

Colantuono & Levin, Michael G. Colantuono, Sandra J. Levin, Lawrence G. Permaul and Amy C. Sparrow for Defendant and Appellant.

Jarvis, Fay & Doporto and Benjamin P. Fay for League of California Cities as Amicus Curiae on behalf of Defendant and Appellant.

**OPINION**

**ASHMANN-GERST, J.**—The power to tax is the power to oppress, and people have rebelled against that power ever since taxes have been imposed. The California voters are no different, and in November 1996, they passed Proposition 218, known as the "Right to Vote on Taxes Act." They demanded, and received, the right to approve any increase of a local tax before it goes into effect.

At issue in this case is the right of voters in the City of Los Angeles (City) to approve or reject an increase in taxes imposed on the charges for the use of cell phones. In 1993, when the City amended Los Angeles Municipal Code

(Municipal Code), chapter II, article 1.1, section 21.1.3 to add subdivision (a)[1] and create a telephone users tax on cellular services (cell tax), the language of the ordinance reached all air time.[2] But that ordinance was limited by the requirement in Municipal Code section 21.1.2 that the cell tax be construed so that it would not violate the United States Constitution. The City and plaintiffs AB Cellular LA, LLC, doing business as AT&T Wireless, Los Angeles SMSA Limited Partnership, doing business as Verizon Wireless, Richard Henson and Robbin Devine-Henry (collectively the carriers) agreed that due to the holding of the United States Supreme Court in *Goldberg v. Sweet* (1989) 488 U.S. 252 [102 L.Ed.2d 607, 109 S.Ct. 582] (*Goldberg*), the cell tax could only be imposed on calls that originated or terminated in the City. Then, in 2002, Congress passed the Mobile Telecommunications Sourcing Act (4 U.S.C. § 116 et seq.) (MTSA)[3] and gave state and local governments authority to impose a tax on all air time, regardless of where calls originate or terminate. The City determined that with the advent of the MTSA it had the authority to unilaterally impose the cell tax on all air time and thereby increase cell taxes. The carriers filed a petition for writ of mandate and a complaint for declaratory relief contending that the City must submit the increased cell tax to the electorate pursuant to Proposition 218. The trial court granted the petition for writ of mandate and entered a judgment that instructed the City to stop collecting the increased cell tax from the carriers' customers in the absence of voter approval. The judgment was silent as to declaratory relief.

██ On appeal, the City argues that Proposition 218 does not apply when a federal act such as the MTSA eliminates a constitutional hurdle to the full enforcement of an ordinance that was in effect in 1993. The carriers cross-appeal and urge us to direct the trial court to declare that the City's increased cell tax violates Proposition 218, is inconsistent with Municipal Code, chapter II, article 1.1, section 21.1.3, subdivision (a), and is not compelled by the MTSA. Upon review, we conclude that the City's unilateral decision to impose the cell tax on all air time violated Proposition 218 and the trial court should have entered a declaration to that effect. Because the

---

[1] This ordinance is part of the telephone, electricity and gas users tax, which appears in chapter II, article 1.1, section 21.1.3 of the Municipal Code. In relevant part, the ordinance reads: "There is hereby imposed a tax upon every person in the City of Los Angeles using telephone communication services including services for intrastate, interstate or international calls, services for mobile cellular telephone communication when the owner or lessee of the telephone has a billing address in the City, and using any teletypewriter exchange services in the City of Los Angeles. The tax imposed by this section shall be at the rate of 10 percent of the charges made for such services and shall be paid by the person paying for such services." (Mun. Code, ch. II, art. 1.1, § 21.1.3, subd. (a).)

[2] Air time is the amount of time during each month the owner or lessee of a cell phone uses his or her cellular service to make calls.

[3] Public Law No. 106-252 (July 28, 2000) 114 Statutes 626.

record is sufficient for us to determine the parties' rights regarding Proposition 218, we modify the judgment to include a declaration that the City's increased cell tax violated the requirement in Proposition 218 that a proposed tax increase be submitted to the voters for approval. As modified, the judgment is affirmed in all other respects.

## FACTS

Goldberg

In *Goldberg*, the United States Supreme Court held that a state tax does not violate the commerce clause if it " 'is applied to an activity with a substantial nexus with the taxing State, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided by the State.' [Citation.]" (*Goldberg*, *supra*, 488 U.S. at pp. 257–258.) Applying this test, the court upheld an Illinois state tax on wire line phone services that applied to calls that originated or terminated in Illinois, and which were charged to an Illinois address. (*Id.* at p. 262.)

Though it was dicta, the court stated: "We believe that only two States have a nexus substantial enough to tax a consumer's purchase of an interstate telephone call. The first is a State like Illinois which taxes the origination or termination of an interstate telephone call charged to a service address within that State. The second is a State which taxes the origination or termination of an interstate telephone call billed or paid within that State. [Citations.]" (*Goldberg*, *supra*, 488 U.S. at p. 263.)

*The City's cell tax and the 1993 instructions*

In 1993, the City proposed amending Municipal Code, chapter II, article 1.1, section 21.1.3 to add subdivision (a) and create a law that would impose a 10 percent cell tax on all cell phone charges for users of cell phones in the City when the owner or lessee of the cell phone had a City billing address. To prevent duplicate taxation of any cell phone service consisting of calls originating or terminating outside the City, it planned to also add subdivision (e) to Municipal Code section 21.1.3 and give a credit to cell phone users who paid a duplicate tax in another taxing jurisdiction.

Once they were apprised of the proposed amendment to Municipal Code, chapter II, article 1.1, section 21.1.3, subdivision (a), the carriers complained that the federal Constitution and *Goldberg* did not permit the cell tax to be imposed on cell phone calls that did not originate or terminate in the City. At the time, Municipal Code section 21.1.2 provided that nothing in the telephone, electricity and gas users tax "shall be construed as imposing a tax

upon any person when imposition of such tax upon that person would be in violation of the Constitution of the United States." Although the carriers were ostensibly willing to collect the cell tax on cell phone calls that originated or terminated in the City, they claimed that they did not have the technology to track the origination or termination of cell phone calls.

The City's tax and permit division approved instructions (1993 instructions) to all providers of cell phone services (providers) regarding the proposed amendment and how it would be implemented. After explaining that the language of Municipal Code, chapter II, article 1.1, section 21.1.3, subdivision (a) applied to all cell phone charges associated with an in-city billing address, the 1993 instructions stated: "Certain cellular telephone industry representatives have stated that their billing systems are capable of applying the [cell] tax to only the monthly charges. . . . [¶] Additionally, they have said that they will be prepared to collect the [cell] tax . . . if the City accepts a [cell] tax calculated only on the monthly charges. With the short time frame provided, and because we have no reason to dispute their position, the City will accept at this time that the [cell] tax will be calculated and remitted on the monthly charges. [¶] However, the City expects that in the near future (1994) that the [cell] tax base will be expanded to also include all [cell phone] calls received and/or terminated in [the City] and to that end we look forward to working with the industry."

The 1993 instructions were sent to the Los Angeles City Council at the same time as the proposed amendment of Municipal Code, chapter II, article 1.1, section 21.1.3. The amendment was adopted and made effective August 9, 1993. Subsequently, the 1993 instructions were forwarded to all providers.

*Proposition 218 and the Proposition 218 Omnibus Implementation Act*

In November 1996, the California voters adopted Proposition 218 and amended the California Constitution to limit local government taxation by adding article XIII C and article XIII D. Pursuant to California Constitution article XIII C, no local government was permitted to impose, extend or increase any general or special tax unless it was submitted to the electorate and approved. In 1997, the Legislature passed the Proposition 218 Omnibus Implementation Act (Omnibus Act) (Gov. Code, § 53750 et seq.)[4] and, in section 53750, subdivision (h)(1)(B), provided that a tax increase occurs when a decision by an agency revises the methodology by which a tax is calculated and the revision results in increased taxes being levied on any person or parcel.

---

[4] All further statutory references are to the Government Code unless otherwise indicated.

*The MTSA*

 In 2000, Congress passed the MTSA, title 4 United States Code sections 116 through 124, and set forth rules for state and local governments to tax mobile telecommunications services. The MTSA was applicable in 2002. Under the MTSA all mobile telephone services provided by a customer's home service provider could be taxed by the taxing jurisdiction "whose territorial limits encompass the customer's place of primary use, regardless of where the mobile telecommunication services originate, terminate, or pass through." (4 U.S.C. § 117(b).) The primary place of use in the MTSA was defined as the customer's residential street address or primary business street address. (4 U.S.C. § 124(8).)

*The February 14, 2002 instructions*

On February 14, 2002, the City notified all providers of their present and future obligations to collect cell taxes under Municipal Code, chapter II, article 1.1, section 21.1.3, subdivision (a) (February 14, 2002 instructions). As to bills issued prior to August 1, 2002, and governed by the 1993 instructions, the City stated: "Be advised that to the extent that you do not include in the tax base [cell phone] service charges for calls originating and/or terminating within the City, your company will be subject to the liability for the amount of uncollected tax. To the extent that you already include in the tax base charges for [cell phone] calls which neither originate nor terminate within the City, you must cease and desist this practice immediately and contact the Tax and Permit Division of the Office of Finance for possible remedial action." As to bills issued on or after August 1, 2002, the providers were told the cell tax would be calculated on a basis consistent with the MTSA. The City averred that the MTSA "changed the nexus law applicable to [cell phone] service charges. Under the [MTSA], the City's [cell tax] base will include [all of] the customer's [cell phone] charges . . . regardless of where individual [cell phone] calls originate or terminate."

*The August 1, 2002 instructions*

The City issued revised cell tax instructions to the providers on August 1, 2002, (August 1, 2002 instructions) pertaining to the implementation of the MTSA. The August 1, 2002 instructions stated: "On February 14, 2002, [the City] directed you to collect the City's [cell tax], in accordance with the provisions of the [MTSA], starting on August 1, 2002. On July 30, 2002, the Los Angeles City Council decided to delay the [MTSA's] implementation until September 15, 2002. In accordance with the [Los Angeles] City Council's instructions, we hereby direct you to disregard our instructions from February 14, 2002 and continue applying and collecting the [cell tax] in

accordance with [the 1993 instructions], in a manner [consistent] with the legal standards set by the United States Supreme Court in [*Goldberg*], until we instruct you otherwise."

*The final instructions*

The City issued its final instructions on December 27, 2002 (final instructions). Providers were told to collect the cell tax "in accordance with [Municipal Code, chapter II, article 1.1,] section 21.1.3 and with the [MTSA]. If you are not already collecting the tax consistent with the City's code and federal law, we instruct you to collect it in the manner indicated above starting on March 1, 2003."

According to the City's Office of Finance, it anticipated that the implementation of the MTSA in the final instructions would increase 2003 tax revenues by $1 million and 2004 tax revenues by $4 million.

*The petition for writ of mandate and complaint for declaratory relief*

The carriers filed a petition for writ of mandate and a complaint for declaratory relief. In their ensuing motion, the carriers sought a judgment instructing the City to rescind the final instructions on the grounds that they violated Proposition 218. Also, they lobbied for a declaration that: (1) The MTSA does not amend local taxing ordinances, and the City may not impose additional taxes on wireless telephone services unless it validly enacts or amends an ordinance. (2) The City must comply with Proposition 218 before increasing taxes. (3) Municipal Code, chapter II, article 1.1, section 21.1.3 does not permit the City to impose the cell tax on the full amount of a customer's monthly and air time charges.

After the matter proceeded to trial, the trial court issued a minute order that provided, in relevant part: "The issue in this proceeding is whether, on March 1, 2003, the City changed, not the [cell] tax law itself[, Municipal Code, chapter II, article 1.1,] section 21.1.3[, subdivision (a)], but its methodology in calculating the [cell] tax in a way that results in an increased amount being levied upon the customers of [the carriers]. [¶] The evidence relevant to this issue is not in dispute. What the City did as of March 1, 2003, was to demand that [the carriers] remit to the City a [cell] tax computed at 10 percent of the total bill sent to and collected from its customers with billing addresses within the [City]. Prior to that time [the carriers] had, with the consent of the City, remitted a [cell] tax calculated at 10 percent of only that portion of the bill sent to its customers that constituted a fixed monthly charge, but not the portion of the bill based on 'airtime,' the number of minutes during the billing period during which the customer actually used the cell phone. [¶] The

[trial court] finds as a matter of law that what the City did constitutes a tax increase within the meaning of [Proposition 218]."

The trial court entered a judgment that ordered the City to stop demanding that the carriers calculate the cell tax as specified in the final instructions, and to reinstate the City's previously applicable 1993 instructions. The judgment was silent with respect to the requested declarations.

The City filed this appeal. The carriers filed a cross-appeal as to issues the trial court did not rule upon. Upon application, we permitted the League of California Cities to appear as amicus curiae.

## THE APPEAL

The City asks us to exercise plenary review over whether the final instructions violated Proposition 218. This request is proper. Thus, our task is to interpret Proposition 218 and the definition of a tax increase in section 53750, subdivision (h)(1)(B) and then apply that law to the undisputed facts. (*Burden v. Snowden* (1992) 2 Cal.4th 556, 562 [7 Cal.Rptr.2d 531, 828 P.2d 672]; *Anserv Ins. Services, Inc. v. Kelso* (2000) 83 Cal.App.4th 197, 204 [99 Cal.Rptr.2d 357].)

This case goes to the heart of direct democracy in California and the rights of citizens to circumvent lawmakers and pass initiatives that will be honored by the executive and judicial branches. Upon review, we find that the final instructions were not permitted by Proposition 218.

Our explanation lies below:

1. *The rules of interpretation.*

■ When engaging in statutory construction, we first look to the words of the statute and " ' "try to give effect to the usual, ordinary import of the language" ' " in order to effectuate the intent of the Legislature. (*California Ins. Guarantee Assn. v. Workers' Comp. Appeals Bd.* (2006) 136 Cal.App.4th 1528, 1534 [39 Cal.Rptr.3d 721]; see *Murillo v. Fleetwood Enterprises, Inc.* (1998) 17 Cal.4th 985, 990 [73 Cal.Rptr.2d 682, 953 P.2d 858].) A close corollary is that we must reject an interpretation that is plainly contraindicated. But not every statute is a beacon of clarity. An interpreting court must go behind a statute's language when it is susceptible of more than one reasonable interpretation. To decipher the purpose of an ambiguous statute, a court may consider the ostensible objects to be achieved by the statute, the statutory scheme of which the statute is a part, the evils to be remedied, public policy, the legislative history, and the wider historical circumstances of

the enactment. (*Nolan v. City of Anaheim* (2004) 33 Cal.4th 335, 340 [14 Cal.Rptr.3d 857, 92 P.3d 350]; *Kane v. Hurley* (1994) 30 Cal.App.4th 859, 862 [35 Cal.Rptr.2d 809].) That said, "[t]he interpretation should be practical, not technical, and should result in wise policy rather than mischief or absurdity." (*Valley Vista Services, Inc. v. City of Monterey Park* (2004) 118 Cal.App.4th 881, 888 [13 Cal.Rptr.3d 433].)

██ Though fairly proximate to statutory construction, the rules for interpreting ballot initiatives to amend our Constitution are governed by some unique guideposts. Precedent teaches that the appellate construction of a constitutional amendment must be delivered in a liberal and practical manner so it will "meet changed conditions and the growing needs of the people." (*Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization* (1978) 22 Cal.3d 208, 245 [149 Cal.Rptr. 239, 583 P.2d 1281].) Normally, the "natural and ordinary" meaning of the amendment's words must be given effect. (*Ibid.*) But the "literal language of enactments may be disregarded to avoid absurd results and to fulfill the apparent intent of the framers." (*Ibid.*) If the amendment is ambiguous, a court may be able to defeat this analytical obstacle by referring to the contemporaneous construction of the Legislature or the administrative agencies that are responsible for implementing the amendment. Also, "the ballot summary and arguments and analysis presented to the electorate in connection with a particular measure may be helpful in determining the probable meaning of uncertain language." (*Id.* at pp. 245–246.) ██ Finally, our Supreme Court instructs that the constitutional amendments given life by Proposition 218 must be interpreted with an eye toward honoring the intent of the voters. (*Bighorn-Desert View Water Agency v. Verjil* (2006) 39 Cal.4th 205, 212 [46 Cal.Rptr.3d 73, 138 P.3d 220].)

2. *Proposition 218 and section 53750.*

Proposition 218, section 2 declared that "[t]he people of the State of California hereby find and declare that Proposition 13 was intended to provide effective tax relief and to require voter approval of tax increases. However, local governments have subjected taxpayers to excessive tax, assessment, fee and charge increases that not only frustrate the purposes of voter approval for tax increases, but also threaten the economic security of all Californians and the California economy itself. This measure protects taxpayers by limiting the methods by which local governments exact revenue from taxpayers without their consent." Section 5 of Proposition 218 provided: "The provisions of this act shall be liberally construed to effectuate its purposes of limiting local government revenue and enhancing taxpayer consent."

Article XIII C, section 2 of the California Constitution provides: "(a) All taxes imposed by any local government shall be deemed to be either general

taxes or special taxes. . . . [¶] (b) No local government may impose, extend, or increase any general tax unless and until that tax is submitted to the electorate and approved by a majority vote. A general tax shall not be deemed to have been increased if it is imposed at a rate not higher than the maximum rate so approved. The election required by this subdivision shall be consolidated with a regularly scheduled general election for members of the governing body of the local government, except in cases of emergency declared by a unanimous vote of the governing body. [¶] (c) Any general tax imposed, extended, or increased, without voter approval, by any local government on or after January 1, 1995, and prior to the effective date of this article, shall continue to be imposed only if approved by a majority vote of the voters voting in an election on the issue of the imposition, which election shall be held within two years of the effective date of this article and in compliance with subdivision (b). [¶] (d) No local government may impose, extend, or increase any special tax unless and until that tax is submitted to the electorate and approved by a two-thirds vote. A special tax shall not be deemed to have been increased if it is imposed at a rate not higher than the maximum rate so approved." (Cal. Const., art. XIII C, § 2.)

Subdivision (h)(1)(B) of section 53750 provides that, for purposes of article XIII C, a tax is increased if a decision by an agency "[r]evises the methodology by which [a] tax . . . is calculated, if that revision results in an increased amount being levied on any person or parcel." Subdivision (h)(2)(B) provides that a tax is not deemed increased if it "[i]mplements or collects a previously approved tax, . . . so long as the rate is not increased beyond the level previously approved by the agency, and the methodology previously approved by the agency is not revised so as to result in an increase in the amount being levied on any person or parcel." (§ 53750, subd. (h)(2)(B).) Section 9 of the Omnibus Act mirrored section 5 of Proposition 218.

3. *The City revised its methodology and impermissibly increased cell taxes.*

The carriers contend that the City revised the methodology by which it calculates the cell tax when it decided to implement the MTSA and expand the cell tax to cover all air time. According to the City, its methodology has been static because it always intended to impose the cell tax to the constitutional limit.[5] As a result, the City posits that even though it believes the federal boundaries for the cell tax base expanded to permit the City to

---

[5] The City contends that the cell tax can be imposed to the full extent of constitutional nexus. We decline to use this nomenclature. Under *Goldberg*, nexus is only one consideration. Proportionality, which ensures that a state is not taxing more than its fair share of an interstate transaction, is equally important. (*Goldberg, supra*, 488 U.S. at pp. 260–261.) Presumably, the City means that it can impose the cell tax to the extent constitutionally permissible.

calculate the cell tax on a broader tax base than before and increase revenues, its methodology was never revised.[6]

It is the carriers that are correct.

a. *Application of Proposition 218 and the Omnibus Act.*

Pursuant to the 1993 instructions, the City signaled that the cell tax would be calculated by multiplying the tax base of monthly charges plus charges for cell phone calls that originated or terminated in the City by 10 percent. At the same time, the City effectively announced that it would not enforce the cell tax as to charges for cell phone calls that originated or terminated in the City until the carriers developed the technology to track those calls.[7] Then, in 2002, the final instructions hailed a sea change and revised the methodology to alter the tax base to include cell phone calls that neither originated nor terminated in the City. The City's new equation for calculating the amount of cell tax due was to multiply the monthly charges plus charges for cell phone calls originating or terminating in the City *plus charges for cell phone calls that did not originate or terminate in the City* by 10 percent. In other words, a new variable was added. By any definition, adding a variable revised the methodology.

■ We arrive at this conclusion after employing a liberal construction of Proposition 218 to limit local government revenue and enhance taxpayer consent. A taxing methodology must be frozen in time until the electorate

---

[6] In its opening brief, the City contends: "Arguably, the Constitutional rules for determining nexus for the taxation of charges for wireless services 'changed' on August 1, 2002, the effective date of the MTSA; certainly, the MTSA dispelled any doubts as to the determination of nexus. In any event, the City does not dispute that as a result of the elimination of this ambiguity, the City's [cell tax] revenue has increased. However, increased revenues alone do not establish a tax 'increase' requiring voter approval under Proposition 218." *Goldberg* supports the City's inference that the analysis for determining the constitutionality of taxes can change. Under *Goldberg*, a court must assess whether a tax is structured in a way that will avoid double taxation, and whether a tax reflects the in-state component of interstate activity. (*Goldberg, supra,* 488 U.S. at p. 261.) Considering rapid changes in communications technology, the appropriate apportionment formula for cell phone charges may well have been fluid prior to the MTSA, i.e., there was a risk of double taxation, etc. But under the MTSA, taxing authority has been standardized. This ostensibly ensures that taxes are proportional. But we cannot concur with the City's next point insofar as it suggests that the voters have no right to vote on a tax increase that resulted from a new methodology permitted by evolving constitutional analysis.

[7] The City contends that cell phone calls that originated or terminated in the City were never part of its methodology because neither the carriers nor the new providers ever collected cell tax on charges for those calls. But that is beside the point. In its various instructions, the City repeatedly trumpeted its intent to collect the cell tax on those charges. That it never did so was an enforcement decision based on the carriers' contention that it was impossible to segregate cell phone calls that could be taxed from those that could not be taxed.

approves higher taxes. This interpretation dovetails with the declarations in section 2 of Proposition 218 because it limits "the methods by which local governments exact revenue from taxpayers without their consent," and it provides "effective tax relief" and requires "voter approval of tax increases." Contrary to the City's position, a local government's methodology cannot evolve—even if it is due to external factors such as the MTSA—and avoid submitting it to voter approval.[8] The Proposition 218 voters rebelled against local government taxes that are moving targets. No doubt a useful precursor to the successful denial of new taxes, in whatever form, is their transparency and consistency, for if taxes are fluid then their increase may well become an intractable problem that would "frustrate the purposes of voter approval."

■ When a statute, or an ordinance, refers " 'to a system or body of laws . . . , the referring statute[, or ordinance,] takes the law or laws referred to not only in their contemporary form, but also as they may be changed from time to time, and . . . as they may be subjected to elimination altogether by repeal. [Citations.]' " (*Palermo v. Stockton Theatres, Inc.* (1948) 32 Cal.2d 53, 59 [195 P.2d 1].) Here, Municipal Code, chapter II, article 1.1, section 21.1.3, subdivision (a) took constitutional law in its contemporary form in 1993 and was subject to changes in that law. And if Proposition 218 had not passed, the City could collect an increased cell tax based on the evolved constitutional parameters. But Proposition 218 was passed, and it arrested the cell tax's maturation over time. This restriction on local tax authority is of course characterized by the City as an unreasonable policy that is sure to create numerous administrative headaches. This fear is unjustified. As we will show, our interpretations of Proposition 218 and the Omnibus Act set forth rules that will aid rather than hinder tax administration.

Section 53750 adds a necessary layer of texture to our analysis.

---

[8] A variant of the City's rationale for its position is that it is "stating the obvious to observe that [c]onsitutional jurisprudence does not (indeed, cannot) develop and change at the same pace as communications technology. In particular, when the use of wireless telephone technology mushroomed during the 1990's, the federal [commerce clause] rules applying to the taxation of charges for traditional wire line telephones did not clearly address cellular technology. As a result of [the carriers'] own lobbying efforts . . . , Congress has now exercised its authority under the Commerce Clause to develop easily administrable and entirely separate rules for . . . the taxation of wireless calls. When the City first adopted [Municipal Code, chapter II, article 1.1, section 21.1.3] in 1993, however, [commerce clause] requirements were unsettled." This point actually supports our opinion. The law was unsettled in 1993, so the City had to take a position regarding the reach of Municipal Code section 21.1.3. Due to Proposition 218, that position was set in stone absent submission of higher taxes to the electorate and a favorable vote. It cannot be disputed that the California voters wanted control over tax changes, regardless of their cause. Thus, it does not matter for purposes of Proposition 218 that taxation law lags behind but eventually adapts to technology. The people want a say in how tax law adapts, if at all.

■ Our role as an appellate court is to give efficacy to the plain language of section 53750, subdivision (h)(1)(B). It provides that a tax is increased if a decision by an agency revises the methodology by which a tax is calculated, if that revision results in an increased amount being levied on any person or parcel. The word "calculated" denotes the math behind a tax. The dictionary definition of "revision" is· "alteration."[9] In practical terms, a tax is increased if the math behind it is altered so that either a larger tax rate or a larger tax base is part of the calculation. But we are mindful that our interpretation of section 53750 must result in wise policy rather than mischief. To that end, we interpret "methodology" so that it does not enshrine taxes that are discriminatory, i.e., taxes that are imposed upon one taxpayer but not others who are similarly situated. Such taxes are anathema to the fair and equal treatment of taxpayers. (See *Hillsborough v. Cromwell* (1946) 326 U.S. 620, 623 [90 L.Ed. 358, 66 S.Ct. 445] ["The equal protection clause of the Fourteenth Amendment protects the individual from state action which selects him out for discriminatory treatment by subjecting him to taxes not imposed on others of the same class"].)· Additionally, we decline to interpret section 53750 to rob local governments of the discretion to settle tax disputes or decide that all or part of a local tax should not be enforced.

■ We hold that "methodology," under section 53750, refers to a mathematical equation for calculating taxes that is officially sanctioned by a local taxing entity. In most instances, the equation will be established by legislative action, such as the·enactment of an ordinance. But if a local tax law is ambiguous, or is ostensibly restricted by state, federal or other local laws, and the local taxing entity develops a policy regarding how those local taxes shall be calculated in light of the ambiguity, or it interprets the limits of the local tax law in light of ostensible restrictions imposed by state, federal, or other·local laws, then the methodology is the equation the local taxing entity adopts as a uniform compromise of its legal dilemma. Restated, this equation is its interpretation of the outer boundaries of its taxing authority.[10]

Under this construction, a local taxing entity can enforce less of a local tax than is due under a voter-approved methodology, or a grandfathered methodology, and later enforce the full amount of the local tax due under that methodology without transgressing Proposition 218. While the settlement of

---

[9] Merriam-Webster's Collegiate Dictionary (10th ed. 1999) page 1003.

[10] The League of California Cities contends that this "lawsuit addresses the·question of whether a city, when faced with uncertainty in the law,·can agree to a temporary compromise in the application of the law until that law is clarified, or whether the city must litigate in order to protect its rights." Because Proposition 218 would lose some of its intended efficacy if local taxes were not transparent and·consistent until there is a voter approved increase, the logical extension of our opinion is that when a taxing authority is confronted with an ambiguous local tax, or a local tax that is restricted by other laws, it may well have to stake out a maximum tax position and then defend that position in litigation. · ,

local tax disputes and enforcement of local taxes may be taxpayer specific,[11] the methodology for the maximum recovery of local taxes will remain constant. A local taxing entity could even revise its methodology to decrease local taxes and then do an about-face and return to the previously approved methodology. Proposition 218 allows it.[12] The evil to be counteracted is the increase of local taxes beyond what was formerly approved. Our interpretation remedies the evil and yet gives local governments flexibility[13] in a way that infringes least upon California's public policy of encouraging settlements and compromises. (*Fisher v. Superior Court* (1980) 103 Cal.App.3d 434, 440 [163 Cal.Rptr. 47].)

### b. *Proposition 218 does not require an improper delegation of power.*

Hoping to avert an unfavorable analysis, the City asserts that a governmental entity cannot delegate its legislative powers. (*Kugler v. Yocum* (1968) 69 Cal.2d 371, 375 [71 Cal.Rptr. 687, 445 P.2d 303] (*Kugler*).) The City raises a concern that our holding will result in the delegation of legislative authority to the administrative staff that interprets the state, federal or other local law that restricts a tax ordinance. To that, we have two responses. Firstly, there was no such delegation here. The Los Angeles City Council approved the 1993 instructions. Secondly, the proscription set forth in *Kugler* was not otherwise implicated. *Kugler* stated: " 'The essentials of the legislative function are the determination and formulation of the legislative policy. Generally speaking, attainment of the ends, including how and by what means they are to be achieved, may constitutionally be left in the hands of others. The Legislature may, after declaring a policy and fixing a primary standard, confer upon executive or administrative officers the "power to fill up the details" by prescribing administrative rules and regulations to promote the purposes of the legislation and to carry it into effect . . . .' [Citation.] Similarly, the cases establish that '[while] the legislative body cannot delegate its power to make a law, it can make a law to delegate a power to determine some fact or state of things upon which the law makes or intends to make its own action depend.' [Citation.]" (*Id.* at p. 376.) Once the City

---

[11] Settling local tax disputes or deciding not to enforce local taxes does not trigger Proposition 218 concerns, but it could transgress other legal principles. That issue is beyond the purview of this opinion.

[12] Among the City's concerns is that a victory for the carriers "would teach that Proposition 218 makes informal accommodation or settlement with taxpayers a permanently expensive proposition for the public fisc." This opinion assiduously avoids that possibility. Contrary to the City's warning, those who act in good faith will not be punished by Proposition 218 and forced to pay higher taxes than others, and neither will Proposition 218 reward "those with the most disputatious policy and the largest legal services budget."

[13] The City argues that " 'methodology' must be determined by looking to the generally-applicable analytical framework for imposing a tax, which might be subject to prosecutorial forbearance and other temporary exceptions under appropriate circumstances." For a number of policy reasons, this is correct and our holding preserves this principle.

made the fundamental policy decision to impose a cell tax to the limits allowed by the federal Constitution, it could delegate authority to administrative staff to determine what those limits were.

### c. The City's historical interpretation is controlling.

The City urges us to give credence to its historical interpretation of Municipal Code, chapter II, article 1.1, section 21.1.3, subdivision (a). But we have. The 1993 instructions embody that historical interpretation. Indeed, the chief one of the tax and permit division of the City's Department of Finance filed a declaration below and averred: "Although the [City's] [o]rdinance extended to airtime, . . . the City opted not to enforce the [o]rdinance as to airtime and allowed [the carriers] to assert an exemption based upon [*Goldberg*] and the impracticability of tracking charges at that time." In effect, the City used Municipal Code section 21.1.2 to constrict the tax base in Municipal Code section 21.1.3, subdivision (a) to calls originating or terminating in the City so that the tax would not be unconstitutional.[14] The City did so by allowing an "exemption."[15] That meant that the City determined that cell phone calls *could not be taxed* if they did not originate or terminate in the City.

By its text, the telephone, electricity and gas users tax had to be interpreted in light of the United States Constitution. The City could not in good faith stand pat and refuse to interpret the commerce clause; it had to take a position, for good or ill. The City did just that. It either believed that Municipal Code, chapter II, article 1.1, section 21.1.3 was limited by *Goldberg*, or it acquiesced to and adopted the interpretation advanced by the carriers. Thus, the City took an official position. It has been held that " 'the contemporaneous construction of a statute by an administrative agency charged with its administration and interpretation, while not necessarily controlling, is entitled to great weight and should be respected by the courts unless it is clearly erroneous or unauthorized . . . . [Citations.]' " (*Anderson v. San Francisco Rent Stabilization & Arbitration Bd.* (1987) 192 Cal.App.3d 1336, 1343 [237 Cal.Rptr. 894].) It cannot be said, on this record, that the City's interpretation was clearly erroneous or unauthorized because the tax base sanctioned as constitutional in *Goldberg* was limited to calls originating or terminating in Illinois if those calls were charged to an Illinois service

---

[14] The City concedes that "[t]he constitutional limitation on the City's authority is automatic, and neither requires nor contemplates any application for a discretionary tax exemption in order to invoke [c]onstitutional limits."

[15] Municipal Code, chapter II, article 1.1, section 21.1.2, which appears in the City's telephone, electricity and gas users tax, is entitled "Constitutional Exemptions" and provides: "Nothing in this article shall be construed as imposing a tax upon any person when imposition of such tax upon that person would be in violation of the Constitution of the United States or that of the State of California." (Mun. Code, ch. 2, art. 1.1, § 21.1.2.)

address. While *Goldberg* applied to wire line telephone calls rather than cell phone calls, and it contained dicta, it was the only guide the City had as to the federal limits of its taxing authority.

We are told by the City that its 1993 cell tax formula for the carriers should not be considered a methodology because it was taxpayer specific.

There is no evidence that the City had one cell tax formula for the carriers and another for others. The chief of the Tax and Permit Division of the City's Office of Finance declared that in about 1995, when new cellular providers (new providers) entered the market, they consistently collected on all air time, regardless of origination or termination. Nonetheless the carriers continued to claim that they could not track the origination or termination of calls, and they continued to refuse to collect cell tax on air time. The City investigated the carriers' claims, and it even made an unsuccessful attempt to get them to collect cell tax on air time sold in packages. Nothing in these facts suggests that prior to the advent of the MTSA the City suddenly changed its reading of *Goldberg* and decided that the commerce clause allowed all air time to be taxed. The City's investigation into the carriers' inability to segregate calls was necessitated only because the City had not changed its reading of *Goldberg*. Otherwise, the issue would have been moot; i.e., the ability to segregate calls would have been irrelevant if the City determined that *Goldberg* did not apply and all air time was taxable. Further to that point, the February 14, 2002 instructions stated: "To the extent that you already include in the tax base charges for [cell phone] calls which neither originate nor terminate within the City, you must cease and desist this practice immediately and contact the Tax and Permit Division of the Office of Finance for possible remedial action."[16]

By this evidence it is demonstrable that the City had a consistent interpretive position from the time Municipal Code, chapter II, article 1.1, section 21.1.3, subdivision (a) was enacted to when it chose to implement the MTSA. The only taxpayer specific decision was the City's enforcement of Municipal Code section 21.1.3, subdivision (a). It chose not to enforce the portion of the cell tax that pertained to cell phone calls originating or terminating in the City with respect to the carriers' customers. Conversely, the City never made

---

[16] The fact that the new providers are collecting and their customers are paying cell tax on all air time does not mean that the imposition of cell taxes on all air time is permissible under Proposition 218. That the new providers have not challenged the cell tax does not prohibit the carriers from rightfully challenging the cell tax and protecting their own customers. The City complains that disparate tax collection will put the new providers at a competitive disadvantage. No doubt that is true. But the culprit is the decision of the new providers and their customers to refrain from seeking the protection of Proposition 218.

an enforcement decision as to the new providers. There was no need. They voluntarily collected the cell tax on all air time, which was contrary to the City's 1993 instructions.

In sum, the City wants us to interpret Proposition 218 so that it permits a fluctuating local government tax if the fluctuation is due to expanding constitutional boundaries. The voters of California stand in the City's path. They demanded the right to approve increased local taxes after finding that such increases "threaten . . . the California economy." We are obligated to uphold that right and adhere to that finding despite the City's protestations. To be sure, the City must be credited for offering thoughtful arguments on a complex issue, but those arguments cannot carry the day, which leaves us but one conclusion: The trial court properly granted the carriers' petition for writ of mandate.

## THE CROSS-APPEAL

The carriers ask us to remand this case to the trial court to enter a declaration that the City's March 2003 tax increase violated Proposition 218, the tax increase is inconsistent with the City's telephone, electricity and gas users tax, and the tax increase was not compelled by the MTSA.

Contrary to the carriers' belief, the City's telephone, electricity and gas users tax permits the March 2003 increase of the cell tax. It is due to Proposition 218 that the cell tax cannot, without voter approval, be increased to include the full cell tax base permitted by an unfettered reading of the text of Municipal Code, chapter II, article 1.1, section 21.1.3, subdivision (a).

Regarding whether the City violated Proposition 218, we note that "[w]henever an appellate court may make a final determination of the rights of the parties from the record on appeal, it may, in order to avoid subjecting the parties to any further delay or expense, modify the judgment and affirm it, rather than remand for a new determination. [Citations.]" (*Sagadin v. Ripper* (1985) 175 Cal.App.3d 1141, 1170 [221 Cal.Rptr. 675].) The record is sufficient for us to determine the parties' rights. Accordingly, we opt to modify the judgment in lieu of remanding this matter for further proceedings. The judgment shall be modified to declare that the City's March 2003 cell tax increase, as reflected in the final instructions, violated Proposition 218.

A declaration regarding the MTSA is moot.

## DISPOSITION

The judgment is modified to include a declaration that the City's March 2003 tax increase, as reflected in the final instructions, violated Proposition 218. As modified, the judgment is affirmed.

The carriers shall recover their costs on appeal.

Boren, P. J., and Chavez, J., concurred.