[Civ. No. 39501. First Dist., Div. Four. Mar. 15, 1978.]

JERALDINE CANE et al., Plaintiffs and Appellants, v.
CITY AND COUNTY OF SAN FRANCISCO et al.,
Defendants and Respondents.

## Counsel

Jerome N. Field and Reed H. Bement for Plaintiffs and Appellants.

Thomas M. O'Connor, City Attorney, George E. Baglin, Deputy City Attorney, Robert M. Adams, Jr., Duane W. Dresser, Cotton, Seligman & Ray, Guilfoyle & Dole and Richard F. Dole for Defendants and Respondents.

## Opinion

**CHRISTIAN, J.**—Jeraldine Cane and associated taxpayers have appealed from a judgment which rejected their challenge to the validity of a provision in certain leases between respondent City and County of San Francisco, as lessor, and respondent corporations, as respective lessees, whereby the city agreed to pay all taxes imposed upon the several leased premises, including the taxes on the lessees' possessory interests.

The three respondent corporations (the City of San Francisco Golden Gateway Parking Corporation, the City of San Francisco Western

Addition Parking Corporation, and the Midtown Park Corporation) are nonprofit corporations; they are separately the tenants of a particular parking garage, or other revenue-producing facilities, constructed in furtherance of urban renewal projects.

The Golden Gateway lease is typical of the others. As part of the redevelopment of the "Embarcadero-Lower Market" area, the Redevelopment Agency of the City and County of San Francisco and Perini-San Francisco Associates, a limited partnership, entered into an "Agreement for Disposition of Land for Private Development." Under the terms of this agreement, the Redevelopment Agency agreed to convey title to the property now known as the Golden Gateway Center to Perini-San Francisco Associates for $6 million. The Redevelopment Agency also agreed to convey a parcel identified as parcel G-1, which was included within that property, for the additional price of $2,590,000. Parcel G-1 has become the site of the Alcoa Building. The parking facility under that building is the subject of one of the leases in issue here.

The land disposition agreement contemplated the formation of a nonprofit corporation to assist the city in providing a public garage facility within parcel G-1; it was specifically provided that Perini-San Francisco Associates could assign the right to purchase the garage site to a nonprofit corporation.

Golden Gateway was incorporated for the purpose of assisting the city's plans by acquiring the property and by constructing, equipping, maintaining and operating the parking facility.

Golden Gateway submitted a proposal, by letter, to the Parking Authority and to the Board of Supervisors of the City and County of San Francisco under which Golden Gateway was to acquire that portion of parcel G-1 known as the "garage site." As consideration for this conveyance, Golden Gateway was to pay $1,090,000 into escrow, which sum was to represent the portion of the total purchase price fairly allocable to the garage site. That sum, plus construction costs, landscaping and other expenses, were to be raised through the issuance of revenue bonds. The proposal further contemplated that Golden Gateway would concurrently convey the garage site to the city for no cash consideration and the city would lease the garage site to Golden Gateway for a 50-year period. Golden Gateway was to operate the garage, charging rates for parking to be established by the city. A portion of the funds derived from issuance of the bonds would be used to erect a

garage to accommodate not less than 1,300 cars. Golden Gateway further undertook to pay to the city the net income from the operation of the garage facility, after having made payments to service and retire its bonds. The proposal was accepted by the board of supervisors.

Golden Gateway Center, successor to Perini-San Francisco Associates, accordingly assigned to Golden Gateway all its right, title and interest under the land disposition agreement to purchase the garage site; Golden Gateway conveyed the garage site to the city by gift deed. Additional documents between Golden Gateway and the city were executed and recorded on December 22, 1964. Among these documents was a lease of the premises by the city to Golden Gateway. That instrument contained the following provision: "19. *Taxes.* Landlord covenants and agrees to pay any and all taxes levied or assessed upon or with respect to the demised premises, or any interest therein (including but not limited to Tenant's possessory interest), and all improvements on the said premises, excepting only any of such taxes which may be assessed against a subtenant or subtenants, if any, of the Tenant under this Lease." It is this provision which appellants challenge. Similar provisions are found in leases held by the other respondents, Western Addition Parking Corporation and Midtown Park Corporation.

To carry out the tax provisions of the leases, the Real Estate Department of the City and County of San Francisco each year includes in its budget request estimates of possessory interest taxes which will be assessed to the lessees. Each year the board of supervisors includes in its appropriation ordinance provision for payment, out of the general fund, of the possessory interest taxes under these leases. The assessor submits to the real estate department his tax bills on the three subject leaseholds. Upon receipt of each tax bill the real estate department requests warrants from the city comptroller to pay the subject leasehold taxes. These warrants are issued each year and delivered to the tax collector for deposit in the general fund; possessory interest taxes on leasehold taxes then show on the records as paid.

Appellants contend that the tax covenants in the leases in question, whereby the city agrees to pay the taxes assessed against the leasehold estate, constitute an unlawful grant of exemption from taxation. All property in the state except as otherwise provided by the state Constitution or by the laws of the United States is taxable in proportion to its full value. (Cal. Const., art. XIII, § 1; see also Cal. Const., art. XIII, §§ 3, 4, 5.) ■ No property is exempt from taxation except as declared in the

Constitution. (See *Pasadena etc. Assn.* v. *County of L.A.* (1945) 69 Cal.App.2d 611, 614 [159 P.2d 679].) If the tax provisions in issue granted an exemption from taxation, those provisions would be invalid. (See 16 McQuillin, Municipal Corporations (3d ed. 1972) Taxation, § 44.65, p. 170; 10 McQuillin, Municipal Corporations (3d ed. 1966) Contracts in General, § 29.06, pp. 239-241; 64 C.J.S. (1950) Municipal Corporations, § 2013, pp. 704-705; 2 Cooley, The Law of Taxation (4th ed. 1924) § 670, pp. 1398-1403.) ■ It is respondents' position that the leases do not provide for an exemption from taxation and that the undertaking to pay all taxes levied against the leasehold is a contractual obligation which the city may validly assume for a good and valuable consideration.

In *Hammond Lumber Co.* v. *Los Angeles* (1936) 12 Cal.App.2d 277 [55 P.2d 891], the City of Los Angeles leased certain parcels of tidelands to the Hammond Lumber Company. The leases were silent as to whether the lessor or the lessee should pay the taxes on the parcels. The lumber company paid the taxes under protest and then brought an action against the city to recover the money paid. The court pointed out that, under the general rule, "when a lease is executed between private parties and it is silent as to which party shall pay taxes, the obligation to pay the taxes rests upon the landlord." (12 Cal.App.2d at p. 279.) The court held, however, that there was an exception to the general rule when there was a lease of land owned by a municipality, since the reversion was exempt from taxation. Since the reversion in such a case is not taxable, the duty to pay taxes on the possessory interest acquired by the private lessee must rest upon the private lessee and not the municipal lessor in the absence of any agreement to the contrary. Quoting *Hammond Lumber Co.* v. *County of Los Angeles* (1930) 104 Cal.App. 235 [285 P. 896], the court stated: " 'When, however, there is a lease of land owned by the state or a municipality, the reversion being exempt from taxation, the usufructuary interest alone is subject to tax in proportion to its value; and in the absence of agreement to the contrary, the tax necessarily falls upon the lessee.' " (*Hammond Lumber Co.* v. *Los Angeles, supra,* 12 Cal.App.2d 277, 281; italics deleted.) It may be inferred from the "in the absence of agreement to the contrary" language of the first *Hammond Lumber Co.* decision that a city lessor lawfully could agree to pay taxes. Several other California cases, involving municipal lessors, have continued to state that in the absence of agreement to the contrary, the tax necessarily falls upon the lessee, thus implying that an agreement to the contrary could properly be made. (See, e.g., *De Luz Homes, Inc.* v. *County of San Diego* (1955) 45 Cal.2d 546 [290 P.2d 544]; *City of Palo*

*Alto* v. *County of Santa Clara* (1970) 5 Cal.App.3d 918, 921 [85 Cal.Rptr. 544].)

Although there is authority to the contrary, other jurisdictions generally have held that a municipality and a private party validly may agree that, as a price of services to be rendered, the municipality will pay a sum equal to the amount of taxes levied upon the private party's property. (See *Portland Water Co.* v. *Town of Portland* (1922) 97 Conn. 628 [118 A. 84]; *Maine Water Co.* v. *City of Waterville* (1900) 93 Me. 586 [45 A. 830]; *Alpena City Water Co.* v. *City of Alpena* (1902) 130 Mich. 518 [90 N.W. 323]; *Monroe Water Works Co.* v. *City of Monroe* (1901) 110 Wis. 11 [85 N.W. 685]; *Grant* v. *The City of Davenport* (1873) 36 Iowa 396; *Bartholomew* v. *City of Austin* (5th Cir. 1898) 85 F. 359, 367-368; *City of Winchester* v. *Winchester Water Works Co.* (1912) 149 Ky. 177 [148 S.W. 1]; *Ludington Water-Supply Co.* v. *City of Ludington* (1899) 119 Mich. 480 [78 N.W. 558]; contra, *Little Falls Electric & Water Co.* v. *City of Little Falls* (1898) 74 Minn. 197 [77 N.W. 40].) Similarly, in *Town of Hampton* v. *Hampton Beach Improvement Co.* (1966) 107 N.H. 89 [218 A.2d 442], the court rejected the contention that a provision in a lease under which the lessor town agreed to pay the taxes on leased property constituted an unconstitutional exemption from taxation. (Also see *City of Phoenix* v. *Landrum & Mills Realty Co.* (1951) 71 Ariz. 382 [227 P.2d 1011].)

A tax exemption is "in the nature of a gratuity." (*Hampton Beach Improvement Co.* v. *Town of Hampton* (1914) 77 N.H. 373 [92 A. 549].) There is no contention in the present case that the consideration for the promise to pay taxes was inadequate or that there was bad faith. On the contrary, the city and county is to receive substantial consideration, e.g., in the undertakings of the lessee to develop and manage the subject property, and surrender possession when the project bonds have been retired. The transaction is not an unlawful exemption from taxation but an agreement by the city that, for an agreed consideration, the city will pay the tax on the leasehold estate. "Where a state or municipality leases its lands and agrees to pay the taxes, there is no exemption from taxation and hence the agreement is not forbidden." (2 Cooley, The Law of Taxation, *supra*, § 668, p. 1398.)

Appellants contend that the tax covenants violate the constitutional requirement of uniformity and equality of taxation. (See *People* v. *Eddy* (1872) 43 Cal. 331, 336; *Cottle* v. *Spitzer* (1884) 65 Cal. 456, 456-457 [4 P. 435].) This contention must be rejected. As the court stated in *Town of*

*Hampton* v. *Hampton Beach Improvement Co., supra,* 218 A.2d 442, 450: "These covenants to save the lessee harmless from the governmental burdens of taxation were part of an agreement entered into between the town and the lessee to advance the interests of Hampton. The costs resulting to the town on account of these covenants constitute an expense of the town in carrying out its functions. They do not differ in legal effect from a payment made by the town to a contractor for services rendered to the town in the execution of its ordinary affairs. We fail to see how these covenants violate the constitutional rules of uniformity and equality governing the assessment and collection of property taxes. Monadnock Regional School District v. Town of Fitzwilliam, 105 N.H. 487, 495, 496, 203 A.2d 46. See Curry v. United States, 314 U.S. 14, 18, 62 S.Ct. 48, 86 L.Ed. 9."

We recognize that there is some authority to the contrary, from other jurisdictions. (See, e.g., *Ehrlich* v. *City of Racine* (1965) 26 Wis.2d 352 [132 N.W.2d 489]; see also *Whipple* v. *Teaneck Tp.* (1947) 135 N.J.L. 345 [52 A.2d 44]; *Edwards* v. *Town of Ponchatoula* (1948) 213 La. 116 [34 So.2d 394]; *Little Falls Electric & Water Co.* v. *City of Little Falls, supra,* 74 Minn. 197 [77 N.W. 40].)

■ Appellants contend that the city's agreement to pay the taxes constitutes an unlawful diversion of public money for the benefit of a private corporation. The performance of a bona fide contract by a public entity is not the making of a gift to a private party. (See *People* v. *City of Long Beach* (1959) 51 Cal.2d 875, 881 [338 P.2d 177].) There was evidence that the entire transaction was intended to serve the public interest of the city; the fact that the private lessee may also receive certain benefits is merely incidental to the public purpose and does not constitute a gift of public funds to a private corporation. (*Town of Hampton* v. *Hampton Beach Improvement Co., supra,* 218 A.2d 442, 451.)

The judgment is affirmed.

Caldecott, P. J., and Wilson, J.,* concurred.

A petition for a rehearing was denied April 4, 1978, and appellants' petition for a hearing by the Supreme Court was denied May 11, 1978.

---

*Assigned by the Chairperson of the Judicial Council.