Filed 8/7/17

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| **RUSSELL CITY ENERGY COMPANY, LLC,**<br><br>        **Plaintiff and Appellant,**<br><br>v.<br><br>**CITY OF HAYWARD,**<br><br>        **Defendant and Respondent.** | **A144749**<br><br>(Alameda County<br>Super. Ct. No. RG14752278) |

The "Payments Clause" of an agreement between Russell City Energy Company, LLC (Russell) and the City of Hayward (City) prohibited the City from imposing any taxes on the "development, construction, ownership and operation" of Russell's power plant except taxes tethered to ownership of real property. The question in this case is whether Russell's interpretation of the Payments Clause violates article XIII, section 31 of the California Constitution (Section 31) which provides "[t]he power to tax may not be surrendered or suspended by grant or contract."

The answer is yes. We conclude Russell's interpretation of the Payments Clause—that the City contractually promised not to impose any taxes other than real property related taxes—violates Section 31 because it surrenders and suspends the City's power to tax the power plant. Thus, the trial court properly determined the Payments Clause was unenforceable and sustained the City's demurrer to Russell's complaint alleging claims premised on a breach of the agreement.

We also conclude, however, that Russell must be permitted an opportunity to amend its complaint to allege a quasi-contractual restitution claim.

1

FACTUAL AND PROCEDURAL BACKGROUND

On appeal from an order sustaining a demurrer, we "accept as true the properly pleaded material factual allegations of the complaint, together with facts that may properly be judicially noticed." (*Crowley v. Katleman* (1994) 8 Cal.4th 666, 672.)

*The Agreement and the Utility Tax*

In October 2005, Russell and the City entered into a Cooperation and Option Agreement (agreement). The purpose of the agreement was to facilitate Russell's construction and operation of the Energy Center, a natural gas-fired, combined cycle electric generating facility in Hayward. In the agreement, the City granted Russell an option to purchase 12.5 acres of City-owned land as the site for the Energy Center. The City also promised to help Russell obtain permits, regulatory approval, and water treatment services for the power plant. Pursuant to the agreement, Russell conveyed a 3.5-acre parcel to the City.

Section 6 of the agreement—the Payments Clause—required Russell to "pay to the City $10,000,000 . . . for the City's design and construction of a new library."[1] The Payments Clause also provides in relevant part: "In the interest of clarity, the Parties acknowledge that payments to be made by [Russell] as contemplated in this Agreement comprise all payments to be made to the City by [Russell], its parents or affiliates in connection with the development, construction, ownership and operation of [the Energy Center] and the City shall not impose any other levies, fees, taxes, contributions, or charges on [Russell], its parents or affiliates other than such levies, fees, taxes, contributions, or charges generally applicable to similarly situated owners of real property located in the City." Section 22 of the agreement contains a severability provision providing: "If any provision, or any portion thereof contained in this agreement is held to be unconstitutional, invalid, or unenforceable, the remainder of this agreement,

---

[1]    The original contracting party assigned its rights to Russell. The agreement was amended in 2006. The amended agreement did not modify the Payments Clause.

or portion thereof, shall be deemed severable, shall not be affected, and shall remain in full force and effect."

When Russell entered into the agreement, it relied on the authority of the City and its representatives to enter into the Payments Clause.[2] Russell acquired real property, entitlements, permits and other assets necessary to build the Energy Center, and incurred "tens of millions of dollars in construction-related" and development costs. In June 2009, Hayward voters approved a Utility Users Tax Ordinance (tax or utility tax) on the usage of electricity and gas, which, as relevant here, imposes "a tax upon every person using electricity in the City. The tax imposed . . . shall be at the rate of five and one-half percent (5.5%) of the charges made for such electricity. . . . The tax shall be collected from the service user." The provision regarding gas usage is substantially similar.

Russell began building the Energy Center in October 2010. In April 2011, the City informed Russell it must pay the utility tax. Russell claimed the Payments Clause prohibited the City from imposing the tax, but it made payments to cover the utility tax assessments. In October 2011, Russell paid the City $10 million as required by the agreement. The Energy Center is complete and operational.

*The Lawsuit*

In 2014, Russell filed a verified complaint against the City alleging claims for: (1) breach of contract; (2) promissory estoppel; (3) anticipatory repudiation; (4) violation of the Contracts clauses of the federal and state constitutions; and (5) declaratory relief.[3] The breach of contract claim and anticipatory repudiation causes of action alleged "the City's promise not to impose levies, fees, taxes, contributions, or charges" on Russell

---

[2]    In Section 14 of the agreement, the City "represent[ed] and warrant[ed] to [Russell] that the person who has executed this Agreement on behalf of the City has been duly authorized to execute this Agreement on behalf of the City." The City Manager and City Attorney signed the agreement, and the City Council approved it.

[3]    After exhausting administrative remedies, Russell sued the City in federal court. That lawsuit was dismissed for lack of subject matter jurisdiction. (*Russell City Energy Co., LLC. v. City of Hayward*, (N.D.Cal., Feb. 17, 2015, No. C-14-03102) 2015 U.S. Dist. LEXIS 26626.)

3

"aside from those expressly authorized under the Agreement" was a "material aspect of the bargain" between Russell and the City. According to the complaint, the City's "bad faith" application of utility tax to Russell "was . . . an intentional breach and deliberate anticipatory repudiation of its promises, covenants and obligations made under the [a]greement." Russell also alleged the City breached the agreement by claiming the City "had no authority to enter into its promise that [Russell] not be subject to certain levies, fees, taxes, contributions or charges." According to the complaint, the City's bad faith conduct "unfairly and unreasonably" deprived Russell of a "substantial portion of the benefits it bargained for under the Agreement, and for which [Russell] . . . paid fair and good consideration . . . ."

The promissory estoppel cause of action alleged the City promised not to impose levies, fees, taxes, or charges "other than expressly allowed in the Agreement" and "warranted its authority to make such promises." Russell relied on those promises by acquiring "real property, entitlements, permits and other assets necessary for development . . . of the Energy Center," beginning construction on the Energy Center, incurring "tens of millions of dollars in construction-related costs," and paying the City $10 million pursuant to the agreement.

In its Contracts clause claim, Russell alleged the imposition of the utility tax in contravention of the agreement violated Russell's contract rights under the United States and California constitutions. According to the complaint, the imposition of the utility tax "effectively nullifies the City's obligations under the [a]greement by imposing . . . unexpected and new liabilities and limitations on the exercise of [Russell's] contractual rights under the [a]greement, which related obligations and covenants [Russell] has already substantially performed." Russell's final claim, for declaratory relief, alleged the parties disagreed regarding the interpretation of the agreement and "whether the City's wrongful retention of fees and monies already paid to the City by [Russell] under the [a]greement, including the $10,000,000 payment made by [Russell], . . . would unjustly enrich the City." Russell sought a judicial declaration the City breached the agreement, and "damages in an amount according to proof."

4

*The City's Demurrer*

The City demurred, arguing the complaint was based on "an erroneous and unconstitutional interpretation of the Payments Clause" and, as a result, failed to state a viable claim. It claimed Russell had no enforceable contractual right to avoid paying the utility tax, explaining: (1) the Payments Clause authorized imposition of taxes " 'generally applicable to similarly situated owners of real property located in the City' "; and (2) the utility tax was " 'generally applicable to similarly situated owners of real property in the City.' " In other words, applying the utility tax to the power plant's operations did not breach the agreement because the Payments Clause did not preclude the City from imposing "generally applicable taxes, [which] are simply the cost of doing business in Hayward." The City also argued a contractual provision exempting Russell from future taxes would unconstitutionally surrender or suspend the City's power to tax in violation of Section 31, which provides, "[t]he power to tax may not be surrendered or suspended by grant or contract." Finally, the City contended Russell's promissory estoppel claim failed because Russell could not "use promissory estoppel to procure 'the indirect enforcement of an illegal contract.' "

In opposition, Russell claimed the utility tax "turn[ed] on the usage of services" not property ownership. Russell also argued the court must accept its interpretation of the Payments Clause at the pleading stage, as long as the interpretation " '*does not place a clearly erroneous construction*' " on the provisions of the contract. Next, Russell claimed the Payments Clause did not violate Section 31 because it represented an exercise—not a surrender—of the City's taxing power. According to Russell, the Payments Clause was an upfront payment in lieu of future taxes, also known as a PILOT agreement.[4] The City's reply argued Russell was impermissibly trying to "secure

---

[4] A payment in lieu of taxes—sometimes abbreviated "PILOT"—is "made to compensate a local government for . . . tax revenue that it loses because of the nature of the ownership or use of a particular piece of real property." (14 McQuillin, The Law of Municipal Corporations (3d ed. 2008) § 38:5, pp. 57-58.) At Russell's request, the court judicially noticed several documents, including a tax settlement agreement between the

5

benefits . . . it never bargained for and that the City could never promise to provide in the first place. . . . [¶] As a matter of law, the City did not, and could not, agree not to enact future taxes applicable to [Russell]."

*Hearing and Order Sustaining Demurrer*

At a hearing, counsel for Russell characterized the Payments Clause as a PILOT agreement and urged the court to uphold it. Russell's attorney also emphasized the unfairness of declining to enforce the agreement, noting the City would be unjustly enriched if permitted to accept the $10 million payment *and* impose the utility tax. Counsel requested leave to amend the complaint to allege the Payments Clause is a PILOT agreement. In response, the City's attorney argued Russell's interpretation of the Payments Clause rendered the City unable to impose taxes—a clear "surrender of the power to tax"—which violated Section 31.

The court questioned whether the Payments Clause represented an "illusory promise" and asked counsel for the City: "[Y]ou have their $10 million. And to just let you walk away from it now after you've gotten the money . . . is that fair?" Ultimately, however, the court sustained the City's demurrer without leave to amend and dismissed the complaint. In a thorough written order, the court determined as a threshold issue it was "not clearly erroneous" for Russell to interpret the Payments Clause as preventing the City from imposing the utility tax because the tax "is assessed based on utility usage, not property ownership." But the court also concluded Russell's interpretation of the Payments Clause violated the California Constitution. As the court explained, "none of the cases cited by [Russell] show how the City's purported agreement not to impose any taxes (other than real property-related taxes) can be reconciled with . . . section 31 of California's Constitution." The court rejected Russell's reliance on municipalities' tax settlement agreements, concluding "[i]n the Payments Clause, the City did not exercise its discretion to receive payments in lieu of taxes. The Court finds that the Payments

---

City of Richmond and Chevron USA, Inc. (Chevron), and a settlement agreement between the County of Alameda and the City of Oakland.

6

Clause would be unconstitutional if interpreted to mean that the City contractually surrendered or suspended its power to tax in violation of . . . section 31."

For these reasons, the court concluded the complaint did not state a claim against the City and sustained the demurrer without leave to amend. The court declined to permit Russell to amend the complaint, noting Russell's interpretation of the Payments Clause "renders it unconstitutional. The court fails to see how this defect can be cured by amendment and [Russell] does not suggest any reasonable possibility that it can be."

DISCUSSION

I.

*General Principles*

As stated above, "[i]n reviewing a judgment sustaining a demurrer without leave to amend, we give the complaint a reasonable interpretation and treat the demurrer as admitting all material facts properly pleaded." (*Coker v. JPMorgan Chase Bank, N.A.* (2016) 62 Cal.4th 667, 671.) " '[W]e examine the complaint de novo to determine whether it alleges facts sufficient to state a cause of action under any legal theory[.]' [Citation.] While our focus is on the pleadings, '[r]elevant matters that are properly the subject of judicial notice may be treated as having been pled.' " (*Requa v. Regents of University of California* (2012) 213 Cal.App.4th 213, 223 (*Requa*).)

Russell's claims are based on contract. "When reviewing whether a plaintiff has properly stated a cause of action for breach of contract, we must determine whether the alleged agreement is 'reasonably susceptible' to the meaning ascribed to it in the complaint. [Citation.] ' "So long as the pleading does not place a clearly erroneous construction upon the provisions of the contract, in passing upon the sufficiency of the complaint, we must accept as correct plaintiff's allegations as to the meaning of the agreement." ' " (*Klein v. Chevron U.S.A., Inc.* (2012) 202 Cal.App.4th 1342, 1384-1385 (*Klein*).) "Thus, to survive demurrer, [Russell] need[s] only set forth a reasonable interpretation of [the agreement]." (*Id.* at p. 1385.) " 'As a reviewing court we are not bound by the construction placed by the trial court on the pleadings but must make our own independent judgment thereon, even as to matters not expressly ruled upon by the

7

trial court.' " (*Aragon-Haas v. Family Security Ins. Services, Inc.* (1991) 231 Cal.App.3d 232, 239 (*Aragon-Haas*).)

II.

*The Payments Clause Violates Section 31 of the California Constitution*

The complaint alleges the Payments Clause prohibits the City from imposing the utility tax. The Payments Clause provides in relevant part: (1) Russell's $10 million payment "comprise[s] all payments to be made to the City" by Russell in connection with the "development, construction, ownership and operation" of the Energy Center; and (2) "the City shall not impose any other . . . taxes, . . . on [Russell], . . . other than such . . . taxes . . . generally applicable to similarly situated owners of real property located in the City."

A.      Russell's Interpretation of the Payments Clause is Not Clearly Erroneous

The tax applies to persons using gas and electricity in the City, and the tax is based on a percentage of electricity and gas charges. A property owner who does not use utilities does not pay the tax. Accordingly, the Payments Clause is "reasonably susceptible of the meaning" alleged in the complaint—that the Payments Clause precludes the City from imposing the utility tax because it is based on utility usage, not property ownership. (*Rutherford Holdings, LLC v. Plaza Del Rey* (2014) 223 Cal.App.4th 221, 229 (*Rutherford*).) We must accept this interpretation at the pleading stage. (*Ibid.*; *Requa, supra,* 213 Cal.App.4th at p. 231 [court must accept allegations as to agreement's meaning unless the construction of the agreement is " 'clearly erroneous' "].)

As it did in the court below, the City contends the Payments Clause authorizes imposition of the utility tax because it is generally applicable to similarly situated real property owners. We reject this argument. The City's "competing" interpretation of the Payments Clause does not demonstrate Russell's interpretation is clearly erroneous. (*Rutherford, supra,* 223 Cal.App.4th at p. 229; *Aragon-Haas, supra,* 231 Cal.App.3d at p. 239.)

B.      The Payments Clause Cannot Be Reconciled with Section 31, Which Prohibits Local Governments from Surrendering or Suspending the Power to Tax

Next, we consider whether the Payments Clause conflicts with Section 31. Article VIII, section 6 of the 1879 California Constitution provided, "The power of taxation shall never be surrendered or suspended by any grant or contract to which the State shall be a party." In 1974, section 6 was replaced with Section 31, which provides "[t]he power to tax may not be surrendered or suspended by grant or contract." (Cal. Const., art. VIII, § 31, added by Prop. 8 (Nov. 5, 1974).) Section 31 applies to local governments. It expresses the principle that "governments cannot divest themselves by contract of the right to exert their governmental authority 'in matters which from their very nature so concern that authority that to restrain its exercise by contract would be a renunciation of power to legislate for the preservation of society or to secure the performance of essential governmental duties.' " (*City of Glendale v. Superior Court* (1993) 18 Cal.App.4th 1768, 1778-1779; *Lin Sing v. Washburn* (1862) 20 Cal. 534, 570 [the "power to tax is a sovereign power, and wherever it exists may be exercised at the will and discretion of the sovereign"].) Thus, California municipalities may not contract away their right to regulate land use (*Alameda County Land Use Assn. v. City of Hayward* (1995) 38 Cal.App.4th 1716, 1724-1725), employ eminent domain (*City of Glendale,* at pp. 1777-1781), or exercise other police powers (*County Mobilehome Positive Action Com., Inc. v. County of San Diego* (1998) 62 Cal.App.4th 727, 735-741).

Section 31 does not define the terms "surrendered" or "suspended."[5] The absence of a statutory provision defining these terms "leads us to presume the Legislature used

_____

[5]     " 'The principles of constitutional interpretation are similar to those governing statutory construction. In interpreting a constitution's provision, our paramount task is to ascertain the intent of those who enacted it. [Citation.] To determine that intent, we "look first to the language of the constitutional text, giving the words their ordinary meaning." [Citation.] If the language is clear, there is no need for construction. [Citation.] If the language is ambiguous, however, we consider extrinsic evidence of the enacting body's intent.' " (*Professional Engineers in California Government v. Kempton* (2007) 40 Cal.4th 1016, 1037.) Russell traces the development of Section 31 in some

9

the[se] word[s] . . . in [their] ordinary sense and, consequently, we may refer to [those words'] dictionary definition[s] to ascertain [their] ordinary, usual meaning." (*County of Kern v. T.C.E.F., Inc.* (2016) 246 Cal.App.4th 301, 318.) The common meaning of surrender is "to give up completely or agree to forgo especially in favor of another." (Merriam-Webster's Collegiate Dict. (11th ed. 2014) p. 1258.) Suspend or " '[s]uspended' is synonymous with temporarily debarred, inactive, inoperative and held in abeyance." (*County of Kern,* at p. 318. [defining " 'suspended' " as " 'temporarily inoperative' "]; see Merriam-Webster's Collegiate Dict. (11th ed. 2014) p. 1259 [defining suspend as "to debar temporarily," or "to cause to stop temporarily," or "to set aside or make temporarily inoperative"].) In the Payments Clause, the City unquestionably suspended its power to tax. The Payments Clause renders the City's power to tax " 'temporarily inactive' " for the life of the power plant. (*County of Kern,* at p. 318.)

A contract that surrenders or impairs a governmental power "is invalid . . . if the contract amounts to a municipality's 'surrender' or 'abnegation' of its control of a municipal function. . . . 'the controlling consideration in this area appears to be whether a disputed contract amounts to a local entity's "surrender," "abnegation," "divestment," "abridging," or "bargaining away" of its control of a [taxing] power or municipal function.' [Citations.] The inquiry thus turns on whether 'this crucial control element has been lost.' " (*108 Holdings, Ltd. v. City of Rohnert Park* (2006) 136 Cal.App.4th 186, 194-195.) Here, the City has "surrendered" its power to tax in the Payments Clause: it has relinquished the crucial element of control of its power to exercise municipal functions by the imposition of "levies, fees, contributions, charges and taxes," except by raising revenue through imposition of taxes on real estate. Russell's interpretation of the

detail, and relies on Section 31's legislative history in an effort to demonstrate the Payments Clause is constitutional. We need not examine Section 31's legislative history because the words "surrender" and "suspend" are not ambiguous. " 'When the language of the statute is clear, we need go no further' [citation]; that is, '[i]f the words themselves are not ambiguous, we presume the Legislature meant what it said, and the statute's plain meaning governs.' " (*Ramirez v. Tulare County Dist. Attorney's Office* (2017) 9 Cal.App.5th 911, 936.)

10

Payments Clause would preclude the City from imposing payroll, business license taxes, and occupancy taxes on the power plant, insulating Russell from virtually all revenue-raising assessments.

Russell's attempts to avoid the purview of Section 31 are unavailing. For example, it claims Section 31 prohibits only "perpetual or irrevocable tax immunity." Russell reasons that the Payments Clause does not violate Section 31 because the City's contractual promise not to impose taxes is "project-specific" (it applies only to the power plant) and is "time-limited" (it applies only to the finite lifespan of the power plant). Russell also contends Section 31 was intended to apply only to "tax immunity in corporate charters, not contract provisions" such as the Payments Clause. These arguments conflict with the plain language of Section 31, which broadly states "[t]he power to tax may not be surrendered or suspended by grant or contract." Nothing in Section 31 authorizes surrenders or suspensions of the power to tax in "project-specific" or "time-limited" situations.[6] As the City points out, were Section 31 so limited, the

---

[6] Two decisions involving the surrender or suspension of police power are instructive. In *Alameda County Land Use Assn. v. City of Hayward* (1995) 38 Cal.App.4th 1716, a memorandum of understanding (MOU) impaired certain municipalities' power to amend their respective general plans regarding 13,000 acres of open space. We held a "local legislative body cannot surrender or impair its delegated governmental power or that of successor legislative bodies either by ordinance or contract. [Citations.] More particularly, a local government may not contract away its right to exercise its police power in the future, and land use regulations involve the exercise of police power." (*Id.* at p. 1724.) We concluded the MOU constituted "an impermissible divestment by respondents of their power and obligation to enact legislation affecting the lands within their respective jurisdictions" notwithstanding the discrete project—the 13,000-acre parcel—to which the MOU applied. (*Id.* at p. 1725.) In *County Mobilehome Positive Action Com., Inc. v. County of San Diego, supra,* 62 Cal.App.4th at pp. 740-741, the Fourth District invalidated a lease agreement exempting mobile home owners from rent control regulations for a 15-year period, concluding the lease "represent[ed] an express effort by the County to 'surrender,' 'abnegate,' 'divest,' 'abridge,' or 'bargain away' its control of a police power or municipal function." By analogy, these decisions support our conclusion that time-limited and project specific surrenders or suspensions of a municipality's taxing power are impermissible.

11

corporation and the municipality could circumvent Section 31 by the municipality's piecemeal surrender of its power to tax.

Russell's reliance on *Valencia Energy v. Arizona Dept. of Rev.* (Ariz. 1998) 959 P.2d 1256 (*Valencia*) does not alter our conclusion. In that case, the Arizona Department of Revenue (department) advised Valencia Energy Company (company) that certain "transportation charges were not subject to tax" and, as a result, the company declined to "charge or collect transaction privilege taxes." (*Id.* at p. 1260.) Later, the department changed course and assessed back taxes against the company. (*Ibid.*) Before the Arizona Supreme Court, the company argued the department was estopped from collecting back taxes because it had advised the company "the activity now levied on was not subject to tax." (*Id.* at p. 1259.) In response, the department argued Arizona's version of Section 31 "absolutely bars estopping the government from collecting taxes owed." (*Id.* at p. 1260.)

The *Valencia* court disagreed, concluding the constitutional provision "restrains all branches of government, but only as to relinquishment of the Legislature's fundamental power to tax. An estoppel from collecting revenue from a single taxpayer for a single event is not the kind of permanent capitulation with which the framers were concerned. We therefore hold that article IX, section 1 is not an absolute ban to estopping the Department." (*Valenica, supra,* 959 P.2d at pp. 1264-1265, fn. omitted.) *Valencia* does not stand for the proposition that a municipality may contractually agree to surrender or suspend future taxes. It simply held the constitutional provision at issue did not prevent application of estoppel to the department. In context, the *Valencia* court's reference to "collecting revenue from a single taxpayer for a single event" describes the payment of back taxes, not a contractual promise not to impose future taxes. (*Id.* at pp. 1265, 1272.)

Nor does Section 31 limit its application to corporate charters, to prohibit "perpetual tax exemptions for all of a corporation's activities" as embodied in a corporation's charter. What Russell characterizes as a "modest textual change" embodied in the 1974 amendment defeats this argument. The 1974 amendment deleted from former section 6 the words "to which the State shall be a party," thereby expanding Section 31's

12

reach to local governmental entities. The regulation of corporate formation and the filing of articles of incorporation are a function of the State through the Secretary of State, not of local municipalities. (See generally Corp. Code, §§ 200-213.) The trial court did not, as Russell suggests, improperly broaden the narrow construction of Section 31 envisioned by the 1878 framers.

We are mindful that the " ' "taxing power of the state is never presumed to have been relinquished unless the language in which the surrender is made is clear and unmistakable." ' " (*Coso Energy Developers v. County of Inyo* (2004) 122 Cal.App.4th 1512, 1533.) Here, the Payments Clause unmistakably surrenders and suspends the City's power to tax. It prohibits the City from imposing any taxes on Russell except real-property related taxes. We cannot agree with Russell that in the Payments Clause, "the City has surrendered nothing."

For the reasons discussed above, we conclude Russell's interpretation of the Payments Clause violates Section 31.

C.    Characterizing the Payments Clause as a PILOT Agreement Does Not Render It Constitutional

Russell contends the Payments Clause represents an *exercise* of the City's taxing power, in the form of a PILOT agreement. According to Russell, interpreting the Payments Clause as providing for "upfront payments in lieu of later taxes—i.e., as a PILOT provision" is the "only sensible reading" of the agreement. We reject this argument for two reasons.

First—and as counsel for Russell conceded at oral argument—the complaint does not allege the Payments Clause is a PILOT agreement. The complaint does not contain the acronym PILOT or the words "in lieu of taxes." Nor is the interpretation of the Payments Clause as a PILOT agreement "apparent from the complaint." (*Rutherford, supra,* 223 Cal.App.4th at p. 229.) Instead the complaint alleges the Payments Clause constituted a "promise not to impose . . . taxes . . . on [Russell], aside from those expressly authorized under the Agreement" and that the City breached the Payments Clause by requiring Russell to pay the utility tax. At the demurrer stage, our focus is on

13

the pleadings.  " ' "[I]n passing upon the sufficiency of the complaint, we must accept as correct plaintiff's *allegations* as to the meaning of the agreement." ' " (*Klein, supra,* 202 Cal.App.4th at pp. 1384-1385, 1387 [no error in sustaining demurrer without leave to amend where complaint did not set forth a reasonable interpretation of alleged agreement]; *Rutherford,* at p. 229 [demurer properly sustained where the plaintiff's interpretation of the agreement was reasonable but was not alleged in the complaint].)

Second, Russell's argument fails even if we assume for the sake of argument the complaint alleged the Payments Clause is a PILOT agreement.[7]  To support its contention that municipalities may enter PILOT agreements, Russell cites two cases, *Cane v. City and County of San Francisco* (1978) 78 Cal.App.3d 654 (*Cane*) and *AB Cellular LA, LLC v. City of Los Angeles* (2007) 150 Cal.App.4th 747 (*AB Cellular*).  *Cane* concerned the validity of leases between the City and County of San Francisco and corporations operating three parking garages.  In the leases, the city agreed to pay all taxes imposed on the leased premises.  (*Cane,* at pp. 655-656.)  Plaintiff taxpayers challenged the tax covenants in the leases, claiming they constituted "an unlawful grant of exemption from taxation." (*Id.* at p. 657.)

A division of this court rejected this argument, concluding a municipality may agree to "pay a sum equal to the amount of taxes levied upon the private party's property." (*Cane, supra,* 78 Cal.App.3d at p. 659.)  *Cane* noted, however, that "[i]f the tax provisions in issue granted an exemption from taxation, those provisions would be *invalid*." (*Id.* at p. 658, italics added.)  *Cane* does not support Russell's argument that the Payments Clause is constitutional; instead, it suggests the Payments Clause is invalid

---

[7]     Russell characterizes the Payments Clause as requiring "up front" payments "in lieu of" all future taxes, i.e., that in making the $10 million payment, Russell obtained a broad exemption from all future local taxes.  The Payments Clause uses neither "up front" or "in lieu of" to describe Russell's payment.  The Payments Clause does not indicate the payment will be credited toward future tax liability, nor that the payment will offset other tax liability owed by Russell.  Instead, the Payments Clause exempts Russell from *all* taxes except those tethered to real property.  We assume without deciding the Payments Clause is a PILOT agreement, and we express no opinion on whether PILOT agreements are generally permissible.

14

because it grants an exemption from taxation. Russell's attempt to distinguish *Cane* is unconvincing.

Nor are we persuaded by Russell's reliance on *AB Cellular*. There, the issue was whether a municipality's enactment of a cell phone tax required voter approval pursuant to Proposition 218. (*AB Cellular, supra,* 150 Cal.App.4th at pp. 757, 758.) The appellate court determined the methodology of calculating the cell phone tax had changed, requiring a Proposition 218 election. (*Id.* at pp. 758, 760-761.) It explained: "a local taxing entity can enforce less of a local tax than is due under a voter-approved methodology, . . . and later enforce the full amount of the local tax due under that methodology without transgressing Proposition 218. While the settlement of local tax disputes and enforcement of local taxes may be taxpayer specific, the methodology for the maximum recovery of local taxes will remain constant. A local taxing entity could even revise its methodology to decrease local taxes and then . . . return to the previously approved methodology. Proposition 218 allows it. The evil to be counteracted is the increase of local taxes beyond what was formerly approved." (*Id.* at pp. 763-764, fn. omitted.)

According to Russell, *AB Cellular* authorizes the use of " 'taxpayer specific' " agreements such as the Payments Clause. We disagree. The *AB Cellular* court did not consider whether an agreement not to impose certain taxes violates the California Constitution. Rather the court interpreted Proposition 218 and Proposition 218's Omnibus Implementation Act, and "the rights of citizens to circumvent lawmakers and pass initiatives." (*AB Cellular, supra,* 150 Cal.App.4th at p. 758.) The court merely noted "[s]ettling local tax disputes or deciding not to enforce local taxes does not trigger Proposition 218 concerns, but it could transgress other legal principles. That issue is beyond the purview of this opinion." (*Id.* at p. 764, fn. 11.) *AB Cellular* does not assist Russell.

Russell claims the Payments Clause was a legitimate way for the City to "provide tax relief" by contract, and that municipalities commonly enter such contractual agreements to its corporate citizens. Russell also claims a municipality may "bargain for

15

up front tax payments based on its best estimate of the other party's future [tax] liabilities." Again, Russell urges "municipalities are *exercising*—not giving up—the power to tax." But that is not what happened here.

*People v. Board of Supervisors* (1932) 126 Cal.App. 670, is instructive. There, the petitioner owned real property to which a lien had attached. (*Id.* at p. 672.) The State of California acquired the land and the petitioner sought cancellation of the lien pursuant to a section of the Political Code. The *Calaveras* court determined the petitioner was entitled to have the liens cancelled. It rejected the argument that the cancellation constituted an impermissible surrender of the power of taxation, explaining: "The facts before us show that the power of taxation was exercised, and that by operation of law, it has ceased to be a charge upon the land for the reason that the land is now the property of the state." (*Id.* at p. 674.) In *Calaveras*, the cancellation of quantifiable tax liability, as required by a provision of the Political Code, represented an exercise of the public entity's taxation power. The same cannot be said here. The Payments Clause does not correlate the payment of $10 million to any quantifiable tax liability.

Russell's reliance on two documents judicially noticed by the trial court is unhelpful. In one document—a tax settlement agreement with the City of Richmond—Chevron agreed to make lump sum payments in exchange for Richmond's withdrawal of a proposed ballot measure amending a utility users tax. Under the agreement, if Richmond imposes new taxes on Chevron's refinery during a specified time period, Chevron will receive a credit for the qualifying portion of the settlement payment. The second document is an agreement between the City of Oakland and Alameda County regarding distribution of parking taxes collected at the Oakland Coliseum. These documents do not assist Russell because they do not involve municipality's promise not to impose taxes.

Russell's interpretation of the Payments Clause violates Section 31 and, as a result, Russell cannot state a claim for contractual relief. The court properly sustained the City's demurrer to the complaint.

III.

16

Russell claims the court erred by denying leave to amend, reasoning it may allege a quasi-contractual claim even if the Payments Clause is unconstitutional. While the decision to sustain a demurrer " 'is a legal ruling subject to de novo review on appeal, the granting of leave to amend involves an exercise of the trial court's discretion. [Citations.] When the trial court sustains a demurrer without leave to amend, we must also consider whether the complaint might state a cause of action if a defect could reasonably be cured by amendment. If the defect can be cured, then the judgment of dismissal must be reversed to allow the plaintiff an opportunity to do so. The plaintiff bears the burden of demonstrating a reasonable possibility to cure any defect by amendment.' " (*Bock v. Hansen* (2014) 225 Cal.App.4th 215, 235.)

Russell contends it can state a claim for "money paid under the [a]greement."[8] In response, the City contends an award of restitution would violate the agreement's severability provision, which provides, "If any provision, or portion thereof contained in this agreement is held to be unconstitutional, invalid, or unenforceable, the remainder of this agreement or portion thereof, shall be deemed severable, shall not be affected, and shall remain in full force and effect. (See *MKB Management, Inc. v. Melikian* (2010) 184 Cal.App.4th 796, 803, fn. omitted.) Here, the trial court implicitly concluded the agreement was severable, and this conclusion is consistent with the City's contention on appeal that "one unenforceable provision would not unravel the entire contract." We do not read the severability provision as precluding the City from bearing "any liability

---

[8] Russell variously refers to this quasi-contractual claim as for "money paid under the [a]greement" and for restitution based on an unjust enrichment theory. "The right to restitution or quasi-contractual recovery is based upon *unjust enrichment*." (1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 1013, p. 1102 (Witkin).) A "party to an express contract can assert a claim for restitution based on unjust enrichment by 'alleg[ing in that cause of action] that the express contract is void or was rescinded.' [Citation.] A claim for restitution is permitted even if the party inconsistently pleads a breach of contract claim that alleges the existence of an enforceable agreement." (*Rutherford, supra,* 223 Cal.App.4th at p. 231.)

under the circumstances presented here." Nor are we persuaded by the City's claim that restitution is somehow unavailable because "untangling" this complex deal would be difficult because the agreement has largely been "executed, and the power plant built."

We disagree with the City's contention that the Payments Clause is "malum in se, such that restitution is prohibited."[9] "There is a marked distinction between contracts which are *malum in se*, and those which are merely *malum prohibitum*." (*Martin v. Wade* (1869) 37 Cal. 168, 174.) Malum in se means "against good morals"—malum in se contracts are "in violation of the general law of public policy, immoral." (Witkin, *supra,* § 431, p. 473; *Martin,* at p. 174; see, e.g., *Vick v. Patterson* (1958) 158 Cal.App.2d 414, 417 [examples of contracts involving moral turpitude].) Traditionally, "parties to a contract *malum in se*, whether it be executory or executed, whether the action be brought on the contract or to recover the consideration, are denied all remedy by the Courts." (*Martin,* at p. 174.)

Malum prohibitum means "prohibited by statute"—malum prohibitum contracts are illegal as contrary to a statute. (See Witkin, *supra,* § 431, p. 473; *Mills, supra,* 121 Cal.App.4th at p. 344, fn. 10 ["illegality set by statute"].) Parties to malum prohibitum contracts may "recover back money paid on [the] contract as the circumstances of the case may require." (*Smith v. Bach* (1920) 183 Cal. 259, 263-264; Witkin, *supra,* § 438,

_____

[9] " 'The illegality of contracts constitutes a vast, confusing and rather mysterious area of the law.' " (*McIntosh v. Mills* (2004) 121 Cal.App.4th 333, 344 (*Mills*).) As relevant here, there are two categories of illegal contracts: (1) those "[c]ontrary to an express provision of law"; and (2) those "[o]therwise contrary to good morals." (Civ. Code, § 1667.) The distinction between contracts malum in se and those which are malum prohibitum is " ' somewhat artificial' " (*Mills,* at p. 344, fn. 10) and of "little significance save where the parties are not *in pari delicto*." (Witkin, *supra,* § 431, p. 473.) " 'The rule denying recovery to a party to an illegal contract is subject to a wide range of exceptions. . . . In each case, the extent of enforceability and the kind of remedy granted depend upon a variety of factors, including the policy of the transgressed law, the kind of illegality and the particular facts. [Citations.]' [Citation.] Among the factors noted [are] that the party claiming illegality would be unjustly enriched if the other party were denied recovery, and that the forfeiture from refusal to permit recovery would be harsh in proportion to the character and extent of illegality." (*South Tahoe Gas Co. v. Hofmann Land Improvement Co.* (1972) 25 Cal.App.3d 750, 759.)

18

pp. 478-479.) "There is no question that the [Payments Clause] is . . . malum prohibitum, as its illegality derives from violation of statute, and is not grounded in common standards of morality." (*Mills,* at p. 344, fn. 10.) While the Payments Clause violates the California Constitution, it is not "immoral," and the City's reliance on a single sentence from *Berka v. Woodward* (1899) 125 Cal. 119 does not demonstrate otherwise.

In one sentence on the last page of its brief, the City argues Russell should not be granted leave to amend because a private party may not sue a public entity on a quasi-contract theory. To support this argument, the City relies on a single case: *Janis v. California State Lottery Com.* (1998) 68 Cal.App.4th 824 (*Janis*).[10] In *Janis*, plaintiffs sued the California State Lottery Commission (CSL), seeking to recover money lost playing Keno before the lottery game was declared illegal. (*Id.* at p. 827.) As relevant here, plaintiffs asserted a claim for " 'restitution and unjust enrichment,' " alleging CSL misrepresented the legality of the game and that they "were entitled to rescind their contracts with CSL to obtain restitution of moneys wagered on the game." (*Id.* at p. 830.)

The trial court sustained CSL's demurrer without leave to amend and the appellate court affirmed. (*Janis, supra,* 68 Cal.App.4th at pp. 828, 834.) First, the *Janis* court determined plaintiffs' claim was "a fraud claim, not a breach of contract claim" because it centered on misrepresentations concerning the legality of the game and plaintiffs' reliance on those representations. (*Id.* at p. 830) The court determined CSL was immune from liability because the claim was "based on tort rather than contract." (*Id.* at p. 831.) Second, *Janis* held plaintiffs did not have a contract with CSL because, "as a matter of law, playing Keno does not create an express contract between CSL and the player." The court then stated, "[l]ikewise, generally a private party cannot sue a public entity on an implied-in-law or quasi-contract theory, because such a theory is based on quantum meruit or restitution considerations which are outweighed by the need to protect and limit

---

[10] We disapprove of the cursory manner in which the City raised this contention, without any discussion or analysis. We exercise our discretion to address it, notwithstanding "the lack of any cogent argument." (*Imagistics Internat., Inc. v. Department of General Services* (2007) 150 Cal.App.4th 581, 591, fn. 8.)

19

a public entity's contractual obligations. [Citation.] Here, then, Janis cannot point to a contractual promise to support this claim." (*Janis, supra,* 68 Cal.App.4th at p. 830.)[11]

  *Katsura v. City of San Buenaventura* (2007) 155 Cal.App.4th 104 (*Katsura*) extended the principle articulated in *Janis* to a public works contract. In *Katsura*, an engineer and a city entered into a contract for consultant services for a maximum price of $18,485. (*Id.* at p. 106.) "The contract required that any modifications were only to be made by mutual written consent of the parties." (*Ibid.*) The city paid the engineer's first two invoices, which totaled $15,565; after completion of the project, the engineer submitted a final invoice for an additional $23,743.75, which the city refused to pay "because it was beyond the maximum contract price and included work that was not authorized by the contract." (*Id.* at p. 107.) The engineer sued the city for breach of contract and common counts. He admitted he did not comply with the contract's written modification requirement, but argued the contract was orally modified to include extra work based on requests by the city's associate engineer and an outside consultant that he perform the work. (*Id.* at pp. 107-108.)

  *Katsura* determined the engineer could not orally modify the contract, explaining: "There is no provision in the City charter for execution of oral contracts by employees of the City who do not have requisite authority. The alleged oral statements by the associate city engineer and project manager are insufficient to bind the City. ' "No government, whether state or local, is bound to any extent by an officer's acts in excess of his . . . authority." ' " (*Katsura, supra,* 155 Cal.App.4th at p. 109.) *Katsura* then held " 'a private party cannot sue a public entity on an implied-in-law or quasi-contract theory, because such a theory is based on quantum meruit or restitution considerations which are outweighed by the need to protect and limit a public entity's contractual obligations.' [Citations.] [¶] . . . The reason is simple: ' "The law never implies an agreement against its own restrictions and prohibitions, or [expressed differently], 'the law never implies an

---

11  The *Janis* court's statement that a private party may not sue a public entity on an implied in law or quasi-contract theory is arguably dicta. At the very least, the principle is more broadly stated than necessary to cover the facts in *Janis*.

20

obligation to do that which it forbids the party to agree to do.' " ' [Citation.] In other words, contracts that disregard applicable code provisions are beyond the power of the city to make." (*Id.* at pp. 109-110.)

As summarized by a division of this court, the rule from *Katsura* is "*all* implied contracts against public entities are barred because, by definition, they have not formally been approved by the entity." (*Green Valley Landowners Assn. v. City of Vallejo* (2015) 241 Cal.App.4th 425, 438.) The rationale for this rule is that "[l]imitations on a municipality's power to contract should be strictly construed because such restrictions are designed to protect the public, not those who contract with the municipality." (*Ibid.*) The principle articulated in *Katsura* has been applied in cases where there was no contract or when there was an attempt to orally modify a written contract. (See *Fairview Valley Fire, Inc. v. Department of Forestry & Fire Protection* (2015) 233 Cal.App.4th 1262, 1271 [no contract]; *Green Valley,* at p. 432 [implied promise]; *Orthopedic Specialists of Southern California v. Public Employees' Retirement System* (2014) 228 Cal.App.4th 644, 649 [implied oral promise]; *P&D Consultants, Inc. v. City of Carlsbad* (2010) 190 Cal.App.4th 1332, 1341 [oral modification to written contract].)

This situation is unlike *Janis*, where there was no contract. Here, Russell can point to a "contractual promise"—albeit one we have held violates Section 31 of the California Constitution. (*Janis, supra,* 68 Cal.App.4th at p. 830.) Nor is this situation like *Katsura*, where the plaintiff attempted to enforce an alleged oral promise that had not been formally approved by the public entity. The issue here is not whether the City formally approved the agreement or had the power to contract: the parties had a written agreement, executed by the City Manager and City Attorney, and approved by the City Council, and no one disputes the City's power to enter a contract to facilitate the construction of a power plant. Finally, this case is distinguishable from subsequent cases applying *Janis* and *Katsura.* In seeking quasi-contractual relief, Russell is not attempting to imply the existence of an extra-contractual agreement, nor is Russell attempting to enforce the invalid provision of the agreement. Rather, Russell is seeking recovery of at least some of the consideration it provided because the City was unable to deliver its

21

promised performance.  Under the unique set of circumstances here, we conclude Russell "should be given an opportunity to amend its complaint to allege" a quasi-contractual restitution claim.  (*First Nationwide Savings v. Perry* (1992) 11 Cal.App.4th 1657, 1669-1670.)

## DISPOSITION

The order sustaining the City's demurrer without leave to amend and dismissing the complaint is reversed to the extent it denies Russell leave to amend.  The matter is remanded with directions to grant Russell leave to amend the complaint consistent with the views expressed in this opinion.  In all other respects, the order is affirmed.  Russell is entitled to costs on appeal.  (Cal. Rules of Court, rule 8.278.)

_____

Jones, P. J.

We concur:


_____

Simons, J.


_____

Bruiniers, J.


A144749

<u>Russell City Energy Company, LLC v. City of Hayward (A144749)</u>


Trial Court:    Alameda County Superior Court

Trial Judge:    Hon. Brenda Fay Harbin-Forte

Counsel:

Winston & Strawn, Robb C. Adkins, Charles J. Moll III, Krista M. Enns and Benjamin J. Kimberley for Plaintiff and Appellant.

Office of City Attorney, Michael S. Lawson; Jarvis, Fay, Doporto & Gibson, Benjamin P. Fay and Gabriel J. McWhirter, for Defendant and Respondent.