Filed 3/25/24  Sack v. Pinner Construction Co. CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FOURTH APPELLATE DISTRICT

### DIVISION THREE

|  |  |
|---|---|
| JOHN A. SACK et al.,<br><br>    Plaintiffs and Appellants,<br><br>        v.<br><br>PINNER CONSTRUCTION CO., INC. et al.,<br><br>    Defendants and Appellants. | G061387<br><br>(Super. Ct. No. 30-2018-01014321)<br><br>O P I N I O N |

Appeals from a judgment of the Superior Court of Orange County, Martha K. Gooding, Judge.  Affirmed as modified.

Thomas H. Edwards for Plaintiffs and Appellants.

Kellan Law Corporation, Newton W. Kellam; Law Offices of Hall R. Marston, Hall R. Marston; Rutan & Tucker, Alejandro S. Angulo, Gerard M. Mooney and Joelle R. Leib for Defendants and Appellants.

Following a bench trial, the trial court found Dirk Griffin (Griffin) and John R. Pinner (Johnny) liable to John A. Sack (Sack) and his wife Vicki Sack (Vicki) for their breach of a February 2017 promissory note (February 2017 Note) for debt previously incurred by Pinner Construction Co., Inc. (PCC).[1]  The trial court found the Sacks' damages award should be reduced by $250,000 because they failed to pursue collection of the cash-payout of an insurance policy that had been offered by PCC's former owner and CEO, John E. Pinner (Pinner), as collateral for the debt underlying the February 2017 Note.

Judgment was entered in favor of the Sacks and against Griffin and Johnny "on their claim for repayment of the amounts owed to them under the [February 2017 Note] in the amount of $2,538,196 plus interest."  Griffin and PCC appealed; the Sacks also appealed.

As to Griffin and PCC's appeal, we conclude the trial court did not err by finding the February 2017 Note enforceable against Griffin, rejecting his illegality and unclean hands affirmative defenses.  For the first time in this appeal, citing Civil Code section 2809,[2] Griffin and PCC argue Griffin is not liable on the February 2017 Note.  For the reasons we will explain, this argument is forfeited.

As for the Sacks' appeal, we conclude insufficient evidence supports the finding the Sacks failed to mitigate their damages.  We therefore modify the judgment to increase the award of damages on the breach of the February 2017 Note claim by $250,000.  As so modified, we affirm the judgment.

---

[1]  Because individuals referenced in this opinion share the same surnames, we follow the same first name references to some utilized by the trial court.  We refer to Sack and Vicki collectively as "the Sacks."

[2]  All further statutory references are to the Civil Code unless otherwise specified.

FACTS

In their respective appellate briefs, the parties rely on the trial court's comprehensive summary of facts contained in the final statement of decision. We therefore rely on, and where indicated, quote the portions of the court's summary of facts that are relevant to the issues presented in this appeal.[3]

I.

THE SEPTEMBER 2014 LOAN AND PROMISSORY NOTE

In September 2014, PCC, a family owned general contracting company, was in severe financial distress. PCC's owner and CEO at the time, Pinner and its then CFO, Griffin, discussed asking Sack, who was Pinner's best friend for more than 50 years, and Griffin's predecessor as PCC's CFO, to loan $2 million to help PCC.[4]

"Sack prepared a written promissory note to memorialize the loan. But Pinner was concerned that disclosing the existence of such a large indebtedness to PCC's banks and sureties would have reduced PCC's borrowing and bonding capability, which

---

[3] In their opening brief, Griffin and PCC state: "The facts the trial court found and the legal conclusions it reached were hotly contested leading up to and throughout the trial. Although Appellants offered evidence and argument contrary to the trial court's factual findings, Appellants recognize the limits of this Court's review and so do not contest those findings on this appeal. Instead, Appellants take issue with the legal conclusions the trial court reached (or failed to reach, as the case may be) based on its factual findings, and recite the following pertinent facts based on the trial court's Final Statement of Decision."

[4] Sack started at PCC as an estimator, then became the controller, and eventually served as CFO from 1981 until 1999. Griffin started with PCC in June 1998 and became CFO when Sack left in 1999. When Griffin later purchased PCC from Pinner on December 28, 2016, Griffin became PCC's owner, president, and CEO. Pinner's son, Johnny, also worked full time at PCC in 1995 and was president from approximately 2012 up until his departure from PCC, a few months after PCC was sold to Griffin.

would have exacerbated PCC's financial straits.[5] So Sack agreed to Pinner's request that the promissory note show only Pinner, [Pinner's wife] Marilyn [Pinner (Marilyn)], and Johnny as the borrowers/obligors.[6] At the same time, however, Pinner and Sack orally agreed that, because the loan was to be made to and for the use of PCC, PCC would be an additional obligor, responsible for repaying the loan on the same terms set forth in the written note. Pinner made that oral agreement on behalf of PCC, in his capacity as its CEO."

Pinner, Marilyn, Johnny, Sack, and Vicki signed the promissory note in October 2014 (2014 Note). The note provided for simple interest at the rate of 4 percent per annum, and a payment schedule with "all principal and accrued interest due and payable in full by October 15, 2017."

On October 16, 2014, Sack provided a cashier's check made payable to Pinner in the amount of $2 million. The funds were deposited into PCC's account and used by PCC for its business. On the 15th of each month thereafter, "Sack went to PCC's office, where he was handed an envelope containing the accrued interest on the 2014

---

[5] "A contractor's bonding capacity is generally a multiple of its net worth. During the relevant period here, PCC's bonding limit was based on a multiplier of 20 times its net worth. Thus, a $2 million decrease in PCC's net worth (corresponding to a $2 million loan liability) would have reduced PCC's bonding capacity by $40 million—a reduction that would have made it more difficult for PCC to get new business. Given that PCC was already struggling financially, that would have had a serious impact on its ability to survive as a viable business."

[6] "Griffin told Pinner, when they discussed the prospect of obtaining a $2 million loan from Sack, that the written loan documentation could not show PCC as a borrower/obligor because of the impact on the company's banks and sureties. They agreed, however, that PCC would be responsible for any loan Pinner was able to obtain from Sack."

Note in cash.[7]  Most of the time, Pinner handed Sack the cash-filled envelope; about 40% of the time, however, it was Griffin who gave Sack the cash.  The interest payments varied depending on the principal balance then due, but they typically were between $6,000 and $9,000 per month."

"Neither the loan nor the method of paying the interest was a scheme to enable the Sacks to either defraud the taxing authorities or avoid paying taxes on the interest income they received from PCC's 'off the books' loan.

"Each month, Sack calculated the interest due and advised Pinner of the amount.  Pinner then conveyed the amount to Griffin, so Griffin could ensure the cash envelope was ready for Sack to pick up.  [Citation.]

"Sack kept a running total of the principal owed and interest paid on the 2014 Note. . . .  All of the principal and interest payments made on the $2 million loan between 2014 and the end of December 2016 were made by PCC.  [Citation.]

"As PCC's CFO, Griffin was fully aware of PCC's dire financial position and the steps PCC was taking to try to stay afloat.  Griffin knew Pinner intended to ask Sack in 2014 for the $2 million loan to PCC; in fact, he and Pinner strategized about it in advance.  Griffin also knew of the 2014 Note, Pinner's agreement to be co-obligor on the loan, PCC's monthly cash interest payments to Sack, and the amounts PCC paid to Sack in principal and interest.  None of this transpired without Griffin's knowledge."

## II.

### THE SACKS MAKE TWO ADDITIONAL LOANS TO HELP PCC

PCC's financial troubles continued despite the $2 million loan, and it had to obtain two more loans from the Sacks, one for $850,000 in February 2015 and another for $500,000 in April 2016.  "Like the $2 million loan that preceded them (and for the

---

[7]  "It was Griffin's idea to have PCC pay the interest in cash.  As PCC's CFO, he knew that because the loans from the Sacks were 'off the books,' it was important for the interest payments to be 'off the books,' too."

same reason), these two additional loans to PCC were 'off the books.' There were no written loan agreements. All this, too, was done with Griffin's knowledge and approval."

Both checks for the two new loans from the Sacks were made payable to PCC, deposited into PCC's business account, and used by PCC for its business expenses. There was no writing memorializing these two additional loans and the 2014 Note was not modified to reflect these loans. "Pinner and Sack orally agreed that both Pinner and PCC were obligated to repay the two additional loans on the same terms set forth in the 2014 Note. Neither Marilyn nor Johnny agreed to repay the additional $1,350,000 in loans made to PCC. They are not parties to the oral agreement made by Pinner (on behalf of himself and PCC) to borrow those additional funds on the same terms set forth in the 2014 Note."

"PCC continued to make monthly cash interest payments to Sack as before. Sack added the $850,000 and $500,000 principal amounts to his running total, and PCC continued to make its cash interest payments to Sack based on the total amount owed on all three loans. PCC also made a number of principal payments on its indebtedness to the Sacks before Pinner sold PCC in December 2016. Those principal payments by PCC totaled $1,309,000. [Citation.][8] [¶] . . . [¶]

"As PCC's CFO, Griffin was fully aware of all of the steps PCC took to obtain additional cash to continue its operations, including all the loans to PCC from the various sources and the terms on which they were made. Griffin knew PCC had orally agreed to repay all three loans from the Sacks. [Fn. omitted.]"

---

[8] "PCC paid the Sacks $200,000 in principal before PCC obtained the additional $850,000 loan; another $750,000 in principal before PCC obtained the additional $500,000 loan; and another $359,000 in principal before Pinner sold PCC in December 2016—for a total of $1,309,000 in principal payments."

6

PINNER DECIDES TO SELL PCC TO GRIFFIN

PCC's financial problems did not resolve. "Pinner told Sack in December 2016 about the proposed sale of PCC to Griffin. Sack knew there was no writing documenting PCC's agreement to repay the initial $2 million loan or the subsequent $850,000 and $500,000 loans. He therefore wanted assurance from Griffin that, if/when he became owner of PCC, he intended PCC to continue to repay the amounts owed to the Sacks. Absent such assurance from Griffin, Sack would have insisted that, before the sale closed, Pinner execute (as PCC's CEO) a written agreement on PCC's behalf memorializing PCC's oral agreements to repay the loans. Pinner, who made the three oral loan agreements with Sack on behalf of PCC, would have complied with any such request; he knew he had obligated PCC to repay the loans, and he would have ensured the Sacks were protected with a writing acknowledging PCC's obligations if Sack had believed it was necessary.[9]

"Sack asked Pinner to set up a meeting with Griffin so they could come to an understanding concerning how Griffin intended to treat the Sacks' loans if and after he became the owner of PCC.

"Griffin, Sack, and Pinner met in mid-December 2016 at PCC's offices. Griffin assured Sack he knew PCC was responsible for repaying all three loans under the terms of the 2014 Note and that he intended PCC to honor those commitments after Griffin purchased the company. Griffin suggested he and Sack meet again in January

---

[9] "In fact, Pinner did just that with respect to a $1 million loan Pinner had obtained in September 2016 for PCC from the family trust of Pinner's friend Dennis Curly. [Citations.] The day before the sale of PCC to Griffin closed, Pinner and Johnny signed, in their capacities as PCC's CEO and President (respectively), a written promise by PCC to repay the Curly Family Trust $1 million by February 28, 2017. [Citation.] They thereby ensured that there was a writing memorializing PCC's agreement to repay the Curly Trust the $1 million it had loaned to PCC in another 'off the books' loan transaction."

2017, after the sale closed, to agree on a new payment structure for the amounts still owing. Sack agreed. On the strength of Griffin's assurance that he intended for PCC to honor its preexisting repayment obligations after he obtained ownership, Sack did not ask Pinner to sign a promissory note on PCC's behalf memorializing the oral agreements."

Pinner sold PCC to Griffin on December 28, 2016.

## IV.

### THE FEBRUARY 2017 NOTE

"Griffin met with Sack in late January 2017, as he had agreed he would. By then, Griffin owned 100% of PCC. They agreed Sack would draft a new promissory note for Griffin to execute, acknowledging PCC's existing indebtedness of $2,101,365 and agreeing to pay that sum, and Griffin would draft a payment schedule to accompany the new note.

"As with the 2014 Note, it was important to Griffin that PCC was not a party to a written promissory note, because such a note would have to be disclosed to PCC's banks and sureties, which would have reduced PCC's borrowing and bonding capability. [Citation.] Given PCC's precarious financial position, that would have harmed the company and its ability to get new construction jobs and stay in business. So Sack agreed PCC would not be a party to the written agreement.

"Griffin and Sack met again in the second week of February to exchange the draft documents each had prepared. At Griffin's insistence, Sack's draft did not include PCC as a signatory on the new note; instead, it simply included a recital acknowledging that PCC was indebted to [Sack and Vicki] in the sum of $2,101,365."[10]

_____

[10] "[The trial court did not find] credible Griffin's testimony that when he and Sack discussed PCC's indebtedness to the Sacks, he had to take Sack's word that PCC owed the Sacks money and in what amount. Griffin already knew what PCC owed on all the loans the Sacks had made to PCC."

8

Thus, PCC was not a party to the note, and the draft Sack prepared did not indicate Griffin was entering into it or executing it on behalf of anyone other than himself.

"Griffin and Sack each approved both drafts, including the promissory note and the new repayment schedule, which called for 7% annual interest. [Citation.][11] Sack agreed to prepare the final versions of each document from the drafts, and they both agreed the final versions would be executed later, at a meeting of all signatories."[12]

Sack scheduled the signing meeting for February 21, 2017 in PCC's office. Sack asked Yvonne Dominguez (Dominguez) to "type the final promissory note, including six signature blocks, and to add the same six signature blocks to the payment schedule Griffin had prepared. Dominguez did so, and Sack took six copies of the final Promissory Note and the final 'Promissory Note Payment Schedule Attachment "A"' ('Schedule A') to the signing meeting, one copy for each signatory. Because Dominguez was a notary, Sack also asked her to come to PCC's offices to notarize the signatures."

Griffin, Pinner, Marilyn, Johnny, Sack, and Vicki were all present at the in-person meeting to sign the new promissory note and payment schedule on February 21, 2017 in PCC's conference room. Each was provided a copy of the final promissory note and Schedule A (together, the February 2017 Note), and all six signatories signed all six copies of the documents during the meeting.

"After all six copies of both documents had been fully executed, Dominguez entered the conference room and prepared acknowledgements for each of the six signatories. [Citation.] Sack gave each signatory a fully executed original of the

---

[11] "Griffin and Sack agreed that the new repayment schedule would also apply to PCC's acknowledged indebtedness."

[12] "At some point between that meeting and the 'all hands' signing meeting on February 21, 2017, Sack added Marilyn Pinner as a signatory on the documents. Marilyn obviously agreed to that, as she attended the final, in-person signing meeting and executed both documents."

[February] 2017 Note, which included both the executed Promissory Note and the executed Schedule A.  [Fn. omitted.]"

During trial, "Griffin [did] not dispute he signed the 2017 Promissory Note . . . .  But he contend[ed] he never signed the Schedule A that went with it.  He contend[ed] the signatures on Schedule A, as well as the signatures in Dominguez's notary book that purport to be his, [were] all forgeries.[13]  Griffin assert[ed] there was no meeting on February 21, 2017 with all six signatories present.  Griffin claim[ed] he met alone with Sack on that date in Griffin's office, and that he signed only the Promissory Note."

The trial court found Griffin's testimony not credible, instead finding "Griffin (like the other signatories) signed six copies of *both* the Promissory Note and the Schedule A and that he did so on February 21, 2017 in the PCC conference room with all the other signatories present.  The [c]ourt also [found] that, in the same meeting, Griffin signed Dominguez's notary book acknowledging he had signed both documents."

V.

SACK LOANS PCC $200,000

Less than a month after the February 2017 Note was executed, Sack received an urgent telephone call from Pinner.  Pinner explained Griffin had just told him PCC could not meet its payroll and needed another, immediate $200,000 loan (the March 2017 loan).  Griffin asked Pinner to seek that loan from Sack for PCC.  "Sack agreed to make the additional loan to PCC because he believed if PCC failed to make payroll, word of its financial troubles would spread rapidly in the contracting community—to subcontractors, owners' representatives, and sureties—and that would cause PCC to fail and be unable to repay the Sacks on the [February] 2017 Note."

---

[13]  "Significantly, Griffin did not call a handwriting, expert to support his forgery contention."

10

Sack issued a check payable to PCC and delivered it that same day. Sack and Griffin orally agreed PCC would repay this new loan in 30 days. "They did not discuss or agree on a specific rate of interest, but both understood the loan would accrue interest. Indeed, Griffin caused PCC to make a $25,000 interest payment to Sack on this loan on November 28, 2018. Sack acknowledges receiving the $25,000 payment from PCC; his damages calculation at trial on this oral loan agreement was based on applying the $25,000 to outstanding interest on the loan. [Citation.] At the statutory interest rate of 10%, accrued and unpaid interest on that sum totals $64,260. [Citation.]

"In addition to causing PCC to pay Sack $25,000 in interest on the $200,000 loan, Griffin caused PCC to send four more checks to Sack in April, May, and June 2019, which totaled $210,000. [Citation.] Sack rejected all four checks. At the time PCC issued the checks, Griffin/PCC had made a settlement proposal to Sack, and Sack reasonably was concerned there were strings attached to the payments—i.e., that the checks were issued pursuant to the proposed settlement, and that by cashing them he would be accepting (or could be deemed to have accepted) Griffin's/PCC's proffered settlement terms, which the Sacks did not find acceptable. [Citation.] It was not unreasonable for Sack to decline to accept or cash the proffered settlement checks from PCC."

## VI.

### CASH-OUT OF COLLATERAL

"At some point, Sack and Pinner orally agreed the Sacks' loans to PCC and Pinner would be collateralized by a $2 million life insurance policy owned by Pinner. But when Pinner cashed in the policy in 2020 for about $250,000, he did not pay the proceeds to Sack. Sack learned Pinner had cashed out the policy, but he took no steps to ensure the proceeds were applied to his loans because he believed his friend needed the money."

11

## VII.

### NEITHER GRIFFIN NOR PCC REPAID THE DEBT OF THE FEBRUARY 2017 NOTE

Ultimately, Griffin and PCC did not repay the Sacks' loans. "That was in part because of the financial difficulties PCC continued to experience after Griffin bought the company, and in part because Griffin and Sack had an acrimonious falling out in July 2017." The Court found "Griffin *did* intend to honor those promises when they were made. Griffin was genuinely trying to pay PCC's creditors and keep the business he had purchased a going concern."

"After subtracting the $60,365 [PCC had already paid to the Sacks], the amount owed on the [February] 2017 Note as of 9/27/2021 [was] $2,041,000 in principal and $747,196 in interest."

## PROCEDURAL HISTORY

The Sacks filed the instant lawsuit in August 2018. In their second amended complaint, the Sacks named PCC, Griffin, the Pinners (Pinner and Marilyn), and Johnny as defendants. They alleged a claim for breach of written contract against all defendants, a claim for fraud against PCC and Griffin, and claims for breach of oral contract, promissory estoppel, open book account, and money had and received against PCC.

In 2020, Griffin and PCC filed a cross-complaint against the Sacks and the Pinners, asserting three causes of action. In their first cause of action, alleged against the Sacks, Griffin and PCC sought rescission of the February 2017 Note and restitution of all benefits conferred under it. They alleged against the Pinners, in the second and third causes of action, claims for implied and equitable indemnity and contribution, respectively.

In 2021, by agreement of the parties, the matter was tried to the court without a jury. By the time of trial, in 2021 the Sacks dismissed their claims against the

12

Pinners.[14]  Consequently, the Sacks' claims at trial were limited to (1) a claim against Griffin and Johnny for breach of written contract (the February 2017 Note); (2) a claim against PCC for breach of oral contract to repay the March 2017 loan; (3) a claim against Griffin and PCC for promissory fraud in connection with both the February 2017 Note and the March 2017 loan; and (4) a claim against PCC for promissory estoppel based on an oral promise allegedly made by Griffin on behalf of PCC in December 2016, in his capacity as PCC's then-CFO.

Pursuant to the parties' agreed-upon procedure, the court issued its proposed statement of decision and the parties submitted written objections to it.[15]  None of the parties' objections to the proposed statement of decision are at issue in this appeal.

In January 2022, the trial court issued its final statement of decision.  The court observed it had "carefully considered all the evidence and argument presented at trial," noted "[i]n many respects, the parties presented sharply conflicting testimony, including on some key factual issues," and confirmed "[t]he [c]ourt's findings and conclusions therefore necessarily reflect its evaluation and determination of the credibility of each witness."

---

[14]  In the statement of decision, the trial court quoted the Sacks' explanation for the dismissal as set forth in their trial brief:  "'Because . . . Pinner and Marilyn . . . have never denied that they are liable for the amounts claimed by the Sacks, and because the Sacks and the Pinners wanted to join forces in order to avoid the cost of paying two lawyers to oppose the cross-complaint filed against them by Griffin and PCC, the Sacks have dismissed their complaint against . . . Pinner and Marilyn . . . without prejudice and subject to an agreement that the Pinners will stipulate to entry of a judgment against them in any subsequent lawsuit filed against them by the Sacks after the trial of their claims against the remaining defendants.'"

[15]  After reviewing the objections, the court requested further briefing concerning the contribution claim in the cross-complaint.  In lieu of supplemental briefs, the parties stipulated to dismissal without prejudice of Griffin and PCC's contribution claim.

The trial court concluded the Sacks proved their claim against Griffin and Johnny for breach of the February 2017 Note and their claim against PCC for breach of the oral contract to repay the March 2017 loan. The court found, however, the Sacks had failed to act reasonably to mitigate their damages by declining to enforce their interest in the insurance policy Pinner had pledged as collateral for his and PCC's obligations. The court thus concluded the Sacks' recovery would be reduced by the $250,000 cash-out value of that policy. The court otherwise found Griffin and PCC failed to prove the affirmative defenses they had asserted, including, as relevant here, the defenses of illegality and unclean hands. The court also found the Sacks had not proven their promissory estoppel claim against PCC or their promissory fraud claim against Griffin and PCC, and further found Griffin and PCC had failed to prove their cross-claims at trial.

Judgment was entered in favor of the Sacks (1) against Griffin and Johnny "on their claim for repayment of the amounts owed to them under the [February 2017 Note] in the amount of $2,538,196, plus interest on this amount at the rate of ten percent (10%) per annum commencing on the date of judgment"; and (2) against PCC "on their claim for repayment of the loan made by them to [PCC] on March 13, 2017 in the amount of $43,830.36, plus interest on this amount at the rate of ten percent (10%) per annum commencing on the date of judgment." The judgment further provided the Sacks "shall take nothing on their remaining claims" against Griffin and PCC, including their claims for promissory fraud and promissory estoppel, and Griffin and PCC "shall take nothing on their remaining cross-claims" against the Sacks and the Pinners, including their claim for rescission of the February 2017 Note and their claim for implied and equitable indemnity.

The court denied the Sacks' and Griffin's respective motions to vacate the judgment and enter a new and different judgment and motions for a new trial. Griffin

14

and PCC filed a timely appeal from the judgment.  The Sacks also filed a timely appeal from the judgment.

DISCUSSION

I.

GRIFFIN AND PCC'S ISSUES ON APPEAL

In their opening brief, Griffin and PCC, "accept[ing] the trial court's findings as being supported by substantial evidence for purposes of this appeal," contend the trial court erred by enforcing the February 2017 Note against Griffin on the grounds (1) it was an unenforceable illegal contract within the meaning of section 1608; (2) it was unenforceable by application of the doctrine of unclean hands; and (3) under section 2809, Griffin was not liable as a guarantor on that note because PCC, as the principal of the underlying debt, was no longer liable for that debt.  We address and reject each of PCC and Griffin's arguments for the reasons we will explain.

A.

*Illegality*

Griffin and PCC argue the trial court erred by enforcing the February 2017 Note which it contends "is an illegal, malum in se,[16] unenforceable contract." (Boldface, underscoring, italics, and capitalization omitted.)  A trial court's determination whether a contract is void and unenforceable because of illegality is a question of law

---

[16]  "Malum in se means 'against good morals' [citation]—malum in se contracts are 'in violation of the general law of public policy, immoral' [citations].  Traditionally, 'parties to a contract malum in se, whether it be executory or executed, whether the action be brought on the contract or to recover the consideration, are denied all remedy by the Courts.'" (*Russell City Energy Co., LLC v. City of Hayward* (2017) 14 Cal.App.5th 54, 71 (*Russell*), italics omitted.)  In contrast, "[m]alum prohibitum means 'prohibited by statute'—malum prohibitum contracts are illegal as contrary to a statute." (*Ibid.*)

15

that we review de novo. (*McIntosh v. Mills* (2004) 121 Cal.App.4th 333, 343 (*McIntosh*).)

1. Governing Legal Principles

A contract must have "[a] lawful object." (§ 1550, subd. (3).) "Where a contract has but a single object, and such object is unlawful, whether in whole or in part . . . the entire contract is void." (§ 1598.) "Where a contract has several distinct objects, of which one at least is lawful, and one at least is unlawful, in whole or in part, the contract is void as to the latter and valid as to the rest." (§ 1599.)

Courts generally will not enforce an illegal contract. (*Wong v. Tenneco, Inc.* (1985) 39 Cal.3d 126, 135 ["""No principle of law is better settled than that a party to an illegal contract cannot come into a court of law and ask to have his illegal objects carried out"""]; *Tri-Q, Inc. v. Sta-Hi Corp.* (1965) 63 Cal.2d 199, 218 (*Tri-Q*); *Lewis & Queen v. N.M. Ball Sons* (1957) 48 Cal.2d 141, 150 ["the courts generally will not enforce an illegal bargain or lend their assistance to a party who seeks compensation for an illegal act"]; *Kashani v. Tsann Kuen China Enterprise Co.* (2004) 118 Cal.App.4th 531, 540 [contract contrary to public policy will not be enforced].)

"'The illegality of contracts constitutes a vast, confusing and rather mysterious area of the law.' [Citation.] Nevertheless, enacted as part of the original Field Codes, the contractual doctrine of illegality has been codified in this state since 1872, and appears as Civil Code section 1608: 'If any part of a single consideration for one or more objects, or of several considerations for a single object, is unlawful, the entire contract is void.' Thus, where the illegal consideration goes to the whole of the promise, the entire contract is illegal." (*McIntosh, supra*, 121 Cal.App.4th at p. 344.) Section 1667, also enacted in 1872, provides: "That is not lawful which is: [¶] 1. Contrary to an express provision of law; [¶] 2. Contrary to the policy of express law, though not expressly prohibited; or, [¶] 3. Otherwise contrary to good morals." (See

16

§ 1607 ["The consideration of a contract must be lawful within the meaning of section sixteen hundred and sixty-seven"]; *Kallen v. Delug* (1984) 157 Cal.App.3d 940, 949 ["The concept of unlawful consideration embraces a promise to refrain from wrongful conduct directed at the promisee or a third person"].)

2.  The Trial Court Did Not Err by Enforcing the February 2017 Note

In the statement of decision, the trial court addressed Griffin and PCC's contention the February 2017 Note, among the other loans/notes at issue during trial, was invalid and unenforceable for illegality.  Griffin and PCC argued the parties' agreed-upon method of paying interest in cash was evidence of "a scheme to defraud taxing authorities" so as to "enable[] the Sacks to avoid declaring the interest as income on their tax returns."

The trial court concluded Griffin and PCC failed to prove illegality of the February 2017 Note as an affirmative defense to its enforcement.  The court reasoned: "There is no credible evidence any of the loans made by the Sacks (the 2014 Note, the [February] 2017 Note, or the $200,000 [March 2017] Loan)—or the cash interest payments—were entered into as part of an illegal scheme to avoid taxes on the part of either the Sacks, the Pinners, or PCC.  [¶] In any event, the 2014 Note is not the subject of any of [Griffin and PCC's] four causes of action.  The manner in which PCC paid interest to the Sacks on the 2014 Note (or whether Sack properly reported interest income for tax purposes) is not relevant to the validity of the [February] 2017 Note and the $200,000 [March 2017] Loan, which are the only two loans alleged as the basis of [Griffin and PCC's] claims."

In their opening brief, Griffin and PCC do not challenge the court's finding none of the loans made by, or the cash interest payments paid to, the Sacks were part of an illegal scheme to avoid taxes.  They also do not contend the loans were made for an

17

illegal purpose—the parties agree the loans were made to help Pinner recover from its financial difficulties.

Griffin and PCC argue it is the "'off the books'" nature of the loans that renders the February 2017 Note illegal, citing the portion of the statement of decision in which the trial court stated the parties' agreements "to keep the loans 'off the books' to avoid disclosing them to PCC's banks and sureties were, at minimum, deceptive, and may have created potential exposure vis a vis the banks or sureties with which PCC did business." There is no dispute the loan agreements were structured in a way to minimize awareness of PCC's financial problems for as long as that would be possible. But Griffin and PCC do not cite to any legal authority that the "'off the books'" nature of the loans as to PCC, in and of itself, violated any law.

There is no contention (or evidence) that during the relevant time periods, PCC (or any related party) was required to disclose PCC's loans to anyone but did not do so; Griffin and PCC do not argue PCC was required to disclose the loans to their *existing* lenders. PCC is not publicly traded.

That the off the books nature of the loans "*may* have created potential *exposure* vis a vis the banks or sureties with which PCC did business" (italics added), as stated by the trial court in the statement of decision, does not establish the illegality of the February 2017 Note. That the loans were structured to essentially hide PCC's indebtedness could certainly put PCC in the position of being able to successfully misrepresent its financial health to a lender or other creditor—but there is no contention (or evidence) PCC or any of the parties ever made such misrepresentations. There is no evidence any party planned to misstate PCC's financial history in seeking future loans from banks or other creditors or, during the relevant time periods, had a duty to disclose the loans to any person but failed to do so. Griffin and PCC's citations to California and federal laws prohibiting misrepresentations about a borrower's financial condition to a

18

lender are therefore inapt.[17]  Instead, the evidence shows the parties intended the cash infusions from the loans to help PCC out of its financial straits before it developed a bad financial reputation which might limit its future lending options and other business opportunities.  Such a plan is not fraudulent and does not otherwise run afoul of the California and federal laws cited by Griffin and PCC in their appellate briefs.

The trial court therefore did not err by rejecting Griffin and PCC's argument the February 2017 Note was unenforceable as illegal or "malum in se."  Even if the court had found Griffin and PCC proved the February 2017 Note to be illegal within the meaning of section 1609, ""[t]he rule denying recovery to a party to an illegal contract is subject to a wide range of exceptions. . . .  In each case, the extent of enforceability and the kind of remedy granted depend upon a variety of factors, including the policy of the transgressed law, the kind of illegality and the particular facts. [Citations.]" [Citation.]  Among the factors noted [are] that the party claiming illegality would be unjustly enriched if the other party were denied recovery, and that the forfeiture from refusal to permit recovery would be harsh in proportion to the character and extent of illegality.'" (*Russell, supra*, 14 Cal.App.5th at p. 70, fn. 9.)

Griffin and PCC would be hard pressed to challenge the application of an exception to the rule denying recovery to a party to an illegal contract here.  There is no question on this record Griffin and PCC would be unjustly enriched if the February 2017 Note was deemed unenforceable based on illegality.  Furthermore, precluding the Sacks from recovering the over $2 million in unpaid debt memorialized in the February 2017

---

[17]  Penal Code section 532a, subdivision (1) forbids the making of false written financial statements about a borrower's financial condition or ability to repay a loan.  Section 1344 of title 18 of the United States Code criminally penalizes the knowing execution or attempted execution of "a scheme or artifice—[¶] (1) to defraud a financial institution; or [¶] (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises."

19

Note "would be harsh in proportion to the character and extent of illegality" present in the parties' agreements here. (*Russell, supra*, 14 Cal.App.5th at p. 70, fn. 9.)

B.

*Unclean Hands Doctrine*

Griffin and PCC also argue the trial court erred by failing to conclude the doctrine of unclean hands barred the Sacks' enforcement of the February 2017 Note. The trial court did not err by rejecting this affirmative defense as well.

1. Governing Legal Principles and Standard of Review

"'The [unclean hands] doctrine demands that a plaintiff act fairly in the matter for which he seeks a remedy. He must come into court with clean hands, and keep them clean, or he will be denied relief, regardless of the merits of his claim.' [Citation.] The doctrine of unclean hands requires unconscionable, bad faith, or inequitable conduct by the plaintiff in connection with the matter in controversy. [Citations.] Unclean hands applies when it would be inequitable to provide the plaintiff any relief, and provides a complete defense to both legal and equitable causes of action." (*Fladeboe v. American Isuzu Motors Inc.* (2007) 150 Cal.App.4th 42, 56.) "Whether the unclean hands doctrine can be applied to a particular transaction is a legal issue reviewed de novo." (*Brown v. Grimes* (2011) 192 Cal.App.4th 265, 274.)

The conduct constituting unclean hands must affect the transaction in issue in the litigation or the equitable relationship between the parties. "Past improper conduct or prior misconduct that only indirectly affects the problem before the court does not suffice. The determination of the unclean hands defense cannot be distorted into a proceeding to try the general morals of the parties. . . . '[T]here must be a direct relationship between the misconduct and the claimed injuries . . . "'so that it would be inequitable to grant [the requested] relief.'"' [Citation.] 'The issue is not that the

20

plaintiff's hands are dirty, but rather "'"that the manner of dirtying renders inequitable the assertion of such rights against the defendant.'"'" [Citation.] The misconduct must "'"prejudicially affect . . . the rights of the person against whom the relief is sought so that it would be inequitable to grant such relief.'"'" (*Kendall-Jackson Winery, Ltd. v. Superior Court* (1999) 76 Cal.App.4th 970, 979 (*Kendall-Jackson*).) In light of the foregoing general principles, "[c]ourts have 'gleaned a three-pronged test to determine the effect to be given to the plaintiff's unclean hands conduct. Whether the particular misconduct is a bar to the alleged claim for relief depends on (1) analogous case law, (2) the nature of the misconduct, and (3) the relationship of the misconduct to the claimed injuries.'" (*Jay Bharat Developers, Inc. v. Minidis* (2008) 167 Cal.App.4th 437, 446–447, citing *Kendall-Jackson, supra*, 76 Cal.App.4th at p. 979.

2. The Trial Court Did Not Err by Finding the Unclean Hands Doctrine Inapplicable

In the statement of decision, the trial court found the unclean hands doctrine inapplicable, stating: "The Court finds [Griffin and PCC] did not prove this defense. There was no unconscionable, bad faith or inequitable conduct by the Sacks (or either of them) that would invalidate any of the loans or otherwise make them unenforceable, or that would make it inequitable to grant [the Sacks] relief. [¶] To be sure, the agreements to keep the loans 'off the books' to avoid disclosing them to PCC's banks and sureties were, at minimum, deceptive, and may have created potential exposure vis a vis the banks or sureties with which PCC did business. But Sack, Pinner, Johnny, Griffin and PCC were all well aware of and willingly participated in that deceptive conduct. It would hardly be equitable for Griffin or PCC to now avoid paying amounts they owe based on conduct in which they were willing and knowing

21

participants. To the extent there are unclean hands here, they belong equally to Sack, Pinner, Johnny, and Griffin."

In their opening brief, Griffin and PCC do not address the three-pronged test used by courts to determine the effect to be given to a plaintiff's purported "unclean hands conduct." (*Jay Bharat Developers, Inc. v. Minidis, supra*, 167 Cal.App.4th at p. 445.) Instead, they argue: "The trial court's conclusion that an unclean hands defense could not prevail if the participants were equally culpable turns the well-settled principle of *in pari delicto* on its head. Under the doctrine of unclean hands, '[o]ne who comes into equity must come with clean hands. A court will neither aid in the commission of a fraud by enforcing a contract, nor relieve one of two parties to a fraud from its consequences when both are *in pari delicto*.' [Citation.] In accordance with this general rule, parties to an unlawful contract who are *in pari delicto* may be denied relief. [Citation.] As we discussed above, an unlawful contract is one contrary to an express provision of law, contrary to the policy of express law, or otherwise contrary to good morals. [Citation] Such contracts are void." (Underscoring omitted.)

"'The doctrine of *in pari delicto* dictates that when a participant in illegal, fraudulent, or inequitable conduct seeks to recover from another participant in that conduct, the parties are deemed *in pari delicto*, and the law will aid neither, but rather, will leave them where it finds them.'" (*Uecker v. Zentil* (2016) 244 Cal.App.4th 789, 792, fn. 1.) Griffin and PCC's reliance on the *in pari delicto* doctrine is misplaced. For the reasons discussed *ante*, the February 2017 Note was not illegal. The trial court did not find the parties had engaged in fraud or that enforcement of the note against Griffin would aid in the commission of fraud. The court found the parties' plan to keep the loans off the books to be deceptive, exposing PCC to possible trouble down the line, but the court did not find that plan to rise to the level of fraud. To the contrary, the trial court expressly found "[t]here was no unconscionable, bad faith or inequitable conduct by the Sacks (or either of them) that would invalidate any of the loans or otherwise make them

22

unenforceable, or that would make it inequitable to grant [the Sacks] relief."
Consequently, the principle of *in pari delicto* is inapplicable.

Turning to the three-prong test, we observe, Griffin and PCC have failed to cite any analogous case law which would support the application of the unclean hands doctrine here. The nature of the misconduct—the Sacks loaning funds "off the books"— did not cause Griffin any injury. Indeed, the trial court expressly found in the statement of decision: "Griffin told Pinner, when they discussed the prospect of obtaining a $2 million loan from Sack, that the written loan documentation could not show PCC as a borrower/obligor because of the impact on the company's banks and sureties. They agreed, however, that PCC also would be responsible for any loan Pinner was able to obtain from Sack."[18]

In short, as the parties' misconduct did not prejudicially affect Griffin's or PCC's rights, it would not be inequitable to grant relief against them. (See *Kendall-Jackson, supra*, 76 Cal.App.4th at p. 979.) The trial court therefore did not err by rejecting Griffin and PCC's unclean hands affirmative defense.

## C.

### *Section 2809*

Griffin and PCC raise a new argument for the first time in their opening brief: They argue because PCC, the principal of the debt underlying the February 2017 Note, has been exonerated of responsibility for that debt, Griffin as guarantor of that debt cannot be liable for it by operation of section 2809. Section 2809 provides: "The obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal; and if in its terms it exceeds it, it is reducible in proportion to the principal obligation." Section 2787 defines the term "surety" as

---

[18] In addition, the court found: "It was Griffin's idea to have PCC pay the interest in cash. As PCC's CFO, he knew that because the loans from the Sacks were 'off the books,' it was important for the interest payments to be 'off the books,' too."

23

follows: "The distinction between sureties and guarantors is hereby abolished. . . . A surety or guarantor is one who promises to answer for the debt, default, or miscarriage of another, or hypothecates property as security therefor." Griffin and PCC argue because the Sacks did not pursue their claims against PCC to judgment, PCC has been effectively exonerated of liability regarding the unpaid debt. Therefore, their argument continues, Griffin as guarantor is necessarily exonerated from liability as well.

In the respondents' brief, the Sacks argue because Griffin and PCC did not raise this issue in the trial court they have therefore forfeited the issue on appeal. (*Bardis v. Oates* (2004) 119 Cal.App.4th 1, 13, fn. 6 ["New theories of defense, just like new theories of liability, may not be asserted for the first time on appeal"].) Griffin and Pinner argue the applicability of an exception to the forfeiture rule: "[A] new theory is properly considered for the first time on appeal when it presents a question of law on undisputed facts. (*R.W.L. Enterprises v. Oldcastle, Inc.* (2017) 17 Cal.App.5th 1019, 1032.)" They argue the undisputed and unambiguous language of the February 2017 Note conclusively establishes Griffin's liability thereunder was limited to that of guarantor of PCC's accumulating debt to the Sacks of which he necessarily is exonerated because PCC, as principal of the debt, is now free from liability for repayment of it.

We do not need to decide whether PCC has been exonerated from all liability to repay the loans upon which the February 2017 Note is based. We disagree with Griffin and PCC that Griffin signed the February 2017 Note only in the capacity of guarantor as a matter of law.[19] In the respondent's brief, the Sacks argue Griffin and PCC's "new theory does involve a factual situation that would have been open to controversy if this defense had been presented at trial. The question whether Griffin was merely a guarantor under the [February] 2017 Note would have been hotly disputed, and

---

[19] We also disagree with their contention at oral argument that the operative complaint shows the Sacks sued Griffin solely in the capacity of guarantor of the February 2017 Note.

the Sacks would have been able to present testimony showing that Griffin understood that he was to be personally liable for payment of the amount stated in the Note, even though he was also guaranteeing that PCC would repay this amount as well. The Sacks did not present testimony on this issue because they had no way of knowing that the issue even existed. The rule prohibiting the presentation of claims and defenses for the first time on appeal is applicable here and should be enforced. [Fn. omitted.]"

Griffin and PCC argue "[t]he hypothesized testimony that Griffin 'understood' he was *personally liable* on the 2017 Note, rather than a *guarantor* of the debtor's payment, is inadmissible evidence to contradict the terms of the writing."

In order to determine whether the Sacks' proposed evidence would be admissible, we turn to the controlling principles of contract interpretation. "The basic goal of contract interpretation is to give effect to the parties' mutual intent at the time of contracting. [Citations.] When a contract is reduced to writing, the parties' intention is determined from the writing alone, if possible. [Citation.] 'The words of a contract are to be understood in their ordinary and popular sense.' [Citations.] [¶] Extrinsic evidence is admissible to prove a meaning to which the contract is reasonably susceptible. [Citations.] If the trial court decides, after receiving the extrinsic evidence, the language of the contract is reasonably susceptible to the interpretation urged, the evidence is admitted to aid in interpreting the contract. [Citations.] Thus, '[t]he test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible.' [Citation.] [¶] The threshold issue of whether to admit the extrinsic evidence—that is, whether the contract is reasonably susceptible to the interpretation urged—is a question of law subject to de novo review." (*Founding Members of the Newport Beach County Club v. Newport Beach Country Club, Inc.* (2003) 109 Cal.App.4th 944, 955.)

We conclude the proposed extrinsic evidence regarding Griffin's liability under the February 2017 Note would be relevant to prove a meaning to which the note is reasonably susceptible. The note certainly provides for Griffin's liability as a guarantor, stating in part: "By the signatures below of Dirk Griffin, John R. Pinner, John E. Pinner and Marilyn M. Pinner, it is understood, agreed and guaranteed individually that if there is a default relative to the attached, agreed upon Schedule 'A', the outstanding balance and all remaining balances at the time of the default shall be paid within Thirty Days." (Boldface omitted.) But that reference does not foreclose the reasonable possibility the parties intended Griffin to be directly and personally liable for the debt as well. The trial court found in the statement of decision that Pinner and PCC were obligated on the Sacks' original 2014 loan for PCC. Indeed, Pinner remains liable for the loans underlying the February 2017 Note. An agreement Griffin would be directly and personally responsible for the debt underlying the February 2017 Note would be consistent with the parties' prior agreements regarding the Sacks' loans for PCC.

Notably, the February 2017 Note does not identify the party responsible for making the referenced payments identified in Schedule A to pay down PCC's indebtedness to the Sacks in the amount of $2.1 million. In addition, the February 2017 Note vaguely refers to "[t]he undersigned," of which Griffin is included, and "all other parties to this Note" as "*endorsers*, guarantors or sureties." (Italics added.) Furthermore, the note does not identify the signatories by any designation of their rights or responsibilities under the terms of the note (e.g., endorser, guarantor, creditor, etc.).

Because the proffered extrinsic evidence would have been admissible to show Griffin was not only a guarantor but personally obligated under the February 2017 Note, Griffin and PCC's argument under section 2809 does not present a question of law on undisputed facts and is thus forfeited for their failure to raise it below.

26

## II.

### THE SACKS' CROSS-APPEAL

In their cross-appeal, the Sacks solely challenge the trial court's finding in favor of Griffin and PCC that Sack did not mitigate his damages with respect to the $250,000 cash-out payment Pinner received on a life insurance policy Pinner had agreed would serve as collateral to Pinner's debt; Sack did not pursue that cash-out payment. In the judgment, the court reduced the amount of damages awarded to the Sacks for the unpaid debt by the $250,000 amount of the cash-out payment.

The Sacks contend the trial court erred by reducing their damages award by the amount of the cash-out payout because: (1) "There was no evidence that John Sack could have taken any additional steps to enforce the agreement pertaining to the life insurance policy because he was already suing John Pinner for the full amount of the indebtedness"; (2) The affirmative defense of failure to mitigate is not applicable to a creditor's decision to enforce a joint and several obligation against one debtor as opposed to another; and (3) In any event, under the terms of the February 2017 Note, as Griffin had agreed he would still be bound to repay on the note in spite of any "'exchange, substitution, or release of any collateral granted as security for this Note,'" he waived the right to assert there had been any failure to mitigate damages based on the release of the insurance policy collateral.

### A.

*Governing Legal Principles and Standard of Review*

"The doctrine of mitigation of damages holds that '[a] plaintiff who suffers damage as a result of either a breach of contract or a tort has a duty to take reasonable steps to mitigate those damages and will not be able to recover for any losses which could have been thus avoided.' [Citations.] A plaintiff may not recover for damages avoidable through ordinary care and reasonable exertion. [Citation.] The duty to mitigate damages does not require an injured party to do what is unreasonable or impracticable. [Citation.]

27

'The rule of mitigation of damages has no application where its effect would be to require the innocent party to sacrifice and surrender important and valuable rights.' [Citation.] [¶] Typically, the rule of mitigation of damages comes into play when the event producing injury or damage has already occurred and it then has become the obligation of the injured or damaged party to avoid continuing or enhanced damages through reasonable efforts." (*Valle de Oro Bank v. Gamboa* (1994) 26 Cal.App.4th 1686, 1691.)

"'Whether a plaintiff acted reasonably to mitigate damages . . . is a factual matter to be determined by the trier of fact . . . .' [Citation.] The burden of proving a plaintiff failed to mitigate damages is on the defendant." (*Agam v. Gavra* (2015) 236 Cal.App.4th 91, 111.)

B.

*Insufficient Evidence Shows the Sacks Failed to Mitigate Their Damages With Regard to the Life Insurance Cash-out Payment*

In the statement of decision, the trial court stated: "With respect to the $250,000 cash-out value of Pinner's life insurance policy: The Court concludes [the Sacks] failed to act reasonably to mitigate their damages by declining to enforce their interest in the insurance policy Pinner pledged as collateral for his and PCC's obligations, opting instead to let their friend keep the collateral and to pursue repayment from Griffin and PCC. Accordingly, [the Sacks'] recovery shall be reduced by that amount." (Underscoring omitted.)

The Sacks argue "there was no evidence that John Sack could have done anything to enforce the agreement to collateralize the insurance policy that he was not already doing." (Boldface and some capitalization omitted.) We agree. The record shows the Sacks filed their lawsuit against the Pinners and the other defendants to recover for unpaid loans and interest in 2018. The trial court found Pinner cashed-out his life insurance policy in 2020, while the lawsuit was pending. At that time, therefore, the Sacks were pursuing recovery of the debt in the courts. There is nothing in the record to

28

show what reasonable action the Sacks could have and should have taken to physically collect the cash-payout in 2020 before final judgment was entered in their lawsuit.  We therefore modify the judgment to increase the Sacks' damages award by $250,000.

## DISPOSITION

As to the damages awarded in favor of Sack and Vicki and against Griffin and Johnny for amounts owing on the February 2017 Note, the judgment is modified to increase that award from $2,538,196 to $2,788,196 plus interest  As so modified, the judgment is affirmed.  Plaintiffs and Appellants Sack and Vicki to recover costs on appeal.

MOTOIKE, J.

WE CONCUR:

O'LEARY, P. J.

DELANEY, J.